FILED

APR 28 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name _____ STEELE, _____ CLAUDE _____ _____
　　　(Last) 　　　　　　　(First) 　　　　　　　(Initial)

Prisoner Number __ C-34972 _____

Institutional Address __ SAN QUENTIN STATE PRISON, SAN QUENTIN CA 94974

═══════════════════════════════════════════════════════

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**E-filing**

CV 08 2181 PJH (PR)

CLAUDE STEELE
_____
Full Name of Petitioner

vs.

ROBERT L. AYERS JR.
_____
Name of Respondent
(Warden or jailor)

Case No.(To be provided by the clerk of court)

PETITION FOR A WRIT OF HABEAS CORPUS

═══════════════════════════════════════════════════════

Read Comments Carefully Before Filling In

### When and Where to File

　　You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

　　If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.  What sentence are you challenging in this petition? . CHALLENGING PAROLE 'DENIAL

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

TEHAMA COUNTY SUPERIOR COURT          TEHAMA, CALIFORNIA
        Court                                  Location

(b)  Case number, if known ___THE3534_____

(c)  Date and terms of sentence __15 YEARS TO LIFE'_____

(d)  Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes χ   No

Where? _SAN QUENTIN STATE PRISON; SAN QUENTIN, CA 94974_
        (Name of Institution)              (Address)

2.  For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

PETITIONER IS CHALLENGING THE 2007 DENIAL OF PAROLE.

STATE COURT DENIALS (EXHIBIT "B".)

3.  Did you have any of the following?

Arraignment: Yes χ  No ___  Preliminary Hearing: Yes χ No ___Motion to Suppress: Yes ___ No ___

3

4.    How did you plead?

Guilty __X__    Not Guilty _____    Nolo Contendere _____

Any other plea (specify) _____

5    If you went to trial, what kind of trial did you have?

Jury _____    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?  Yes __ No __

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment  Yes __X__        No __
(b)    Preliminary hearing          Yes X        No __
(c)    Time of plea  Yes __X__      No _
(d)    Trial  Yes __  No __
(e)    Sentencing  Yes __X__      No __
(f)    Appeal      Yes ____      No
(g)    Other post-conviction proceeding    Yes __        No __

8.    Did you appeal your conviction?  Yes __ No _X_

(a)    If you did, to what court(s) did you appeal?

Court of Appeal    Yes __    No __
_____    _____
                                (Year)                        (Result)

Supreme Court of
California          Yes ___    No __
_____    _____
                                (Year)                        (Result)

Any other court    Yes __    No __
_____    _____
                                (Year)                        (Result)

(b)    If you appealed, were the grounds the same as those that you are raising in this
petition?                                        Yes __ No __

(c)    Was there an opinion?        Yes    No

(d)    Did you seek permission to file a late appeal under Rule 31(a)?
                                Yes        No

If you did, give the name of the court and the result:

9.      Other than appeals, have you previously filed any petitions, applications or motions with
respect to this conviction in any court, state or federal?      Yes   x        No ___

I HAVE TWO HABEAS ACTIONS PENDING IN THIS COURT REGARDING
DENIAL OF PAROLE IN 2005 AND 2006.

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.    N/A, PETITIONER SUBMITTED A HABEAS PETITION REGARDING THE DENIAL OF PAROLE. ' % : : : : : T

I.    Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a.    _____

b.    _____

c.    _____

d.    _____

Result _____ Date of Result _____

II.    Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a.    _____

b.    _____

c.    _____

d.    _____

Result _____ Date of Result _____

III.    Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____   Date of Result _____

    (b)   Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes _X No _TWO HABEAS PETITIONS IN THIS COURT REGARDING THE DENIAL OF PAROLE IN 2005 AND 2006.

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT

(Name and location of court)

## B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need more space. Answer the same questions for each claim.

Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One: SEE ATTACHED PAGES 1-12 _____

Supporting Facts: SEE ATTACHED PAGES 1-12

Claim Two: SEE ATACHED PAGES 12-14

Supporting Facts: SEE ATTACHED PAGES 12-14

Claim Three: SEE ATTACHED PAGES 14-16

Supporting Facts: SEE ATTACHED PAGES 14-16

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

N/A

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

SEE ATTACHED PAGES

Do you have an attorney for this petition?    Yes __ No X   PETITIONER REQUEST FOR
                                                            APPOINTMENT OF COUNSEL
If you do, give the name and address of your attorney:      DUE TO THE COMPLEXITIES
                                                            THIS THIRD ACTION BEFORE
                                                            THIS COURT.

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on  4-22-08                    _____
                Date                    Signature of Petitioner

( rev. 5/96)

9

## CONTENTION

### I.

### THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S STATE AND FEDERAL DUE PROCESS WHEN IT MADE A DETERMINATION OF UNSUITABILITY WITHOUT "SOME EVIDENCE"

Petitioner Claude Steele Jr., (Petitioner) appeared before the Board of Parole Hearings on July 23, 2007, for his 14th (13th hearing over all) and was denied parole for one year. The Board stated the following reasons for their denial:

1. First of all, this offense was carried out in an especially cruel and callous manner.

2. This offense was carried out dispassionately.

3. This offense was carried out in a manner demonstrating callous disregard for human suffering.

4. This crime was very trivial in relation to the offense and you had a clear opportunity to cease

5. This Panel feels that this crime was more than the minimum necessary for the conviction of a murder second degree.

6. And hearken to your history, you do have violence in your history as a juvenile.

7. You have unstable social history and chose an escalating pattern of criminal conduct.

(Exhibit "A" pp. 77-79)

The Board then made several favorable finding:

1. Your prison work has been very stable prison work.

2. You have done exceptional vocational certification.

3. You have marketable skill that you've developed.

4. As to self-help and therapy, you did show that you are aware of the steps and are working them and you appear to have internalized them.

5. However, the clinician evaluated you as rating low range on the clinical insight factor for propensity

1

for future violence.

6. As to your parole plans, you do appear to have viable parole plans ..

(Exhibit "A" pp. 79-82)

The Board's decisions are governed by the California Penal Code § 3041 (a) states that the Board "shall normally set a parole release date" when a prisoner approaches their minimum parole eligibility released date. However, the California Supreme Court has held that the Board must first consider, under section 3041 (b), whether a prisoner's commitment offense and or past offenses require further delay in setting a release date because of public safety concerns. The overarching factor regarding parole is whether a prisoner still poses a threat to public safety. (In re Barker, 59 Cal. Rptr.3d 746, 760).

The California Supreme Court has also established a standard of review in parole denial cases, a "some evidence" test, based on the due process requirements of the California Constitution. The Ninth Circuit has also constructed a standard of review in such cases based on the due process clause of the U.S. Constitution. The Federal standard applied by district courts in the Ninth Circuit also use the "some evidence" language--requiring affrimance of the decision denying parole. The Ninth Circuit further adds that the Board's decision must have "some indicia of reliability." McQuillion v. Duncan, 306 F.3d 895, 904 (9th Cir. 2002).

In the instant action the Board relied primarily on the commitment offense to deny Petitioner parole. The commitment offense can be relied on to deny parole if there is "some

2

evidence" in the record that Petitioner poses a threat to public safety. The Supreme Court in In re Rosenkrantz, 29 (2002) Cal.App.4th explained that denial of parole could be based upon the nature of the commitment offense alone, however, the Rosenkrantz Court cautioned that "a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation--for example where no circumstances of the offense could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense.

Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public. [Citation.] 'The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. Otherwise, the Board's case-by-case rulings could destroy the proportionality contemplated by Penal Code Section 3041, subdivision (a), and also by the murder statute, which provide distinct terms of life without possibility of parole, 25 years-to-life, and 15 years-to- life for various degrees and kinds of murder.) Pen.Code, § 190 et. seq.) [] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.'" In re Rosenkrantz, 29 Cal.App.4th 616, 68.; 128 Cal.Rptr.2d 104. 59 P.3d 174

3

(italics added).

The California Supreme Court in In re Dannenberg, (2005) 34 Cal.App.4th  061, 1095, has provided additional explanation as to when a commitment offense alone is sufficient to deny parole. Specifically, the Dannenberg court explained when a commitment offense is "particularly egregious." The Dannenberg court stated: "Our discussion [in Rosenkrantz], including our use of the phrase 'particularly egregious' conveyed only that the violence vicious or viciousness of the inmate;'s crime must be more than the minimally necessary to convict him of the offense for which he is confined."

As stated above, the overarching consideration is public safety. The test is not whether there is some evidence that supports the Board's reasons's for denying parole, but whether there is some evidence that Petitioner's release poses a threat to public safety. Petitioner has consistently been found not to pose a threat to public safety. The Board pointed out that the professional psychologist determined that Petitioner did not pose a threat to public safety. The Board than found that Petitioner has sufficiently programmed and had viable parole plans.

By the Board's own statements  Petitioner has been a model prisoner for many years. He has maintained family ties, with his mother (who recently past), and siblings throughout his incarceration. Yet the Board continues to arbitrarily and capriciously find that Petitioner's release would pose an unreasonable risk to society. This finding is unsupported by any evidence in the record, thus violating Petitioner's due

4

process rights. (In re Rosenkrantz, supra, at p. 658; Interes of Nebraska Penal (1979) 442 U.S. 1; Board of Pardons v. Allen (1987) 482 U.S. 369.).

In 2006 Petitioner sought habeas relief in the Tenama County Superior Court and was denied. The superior court stated that it was unclear what more Petitioner needed to do to obtain parole, and that it was unfortunate that the law allows for denial of parole based on the commitment offense. The Appellate Court in In re Gray, 59 Cal.Rptr.3d 724, 741-742 (Cal.App.3d Dist. 2007), held that parole is the rule for second degree murder, not the exception. Even if the Tehama County Superior Court's 2006 decision is true, that the law allows for denial of parole based on the commitment alone, after 14 hearings, 25 years later, continuous denial of parole based on the commitment offense alone violates Petitioner's State and Federal due process rights. The Court in In re Scott, (2004) stated the following:

> "[p]arole is the rule, rather than the exception and conviction for second degree murder does not automatically render one unsuitable. (In re Smith, (2003) 114 Cal.App.4th 343, 366, italics omitted.)

The Court then attached a caveat:

> As the Court explained, "[a]ll violent crime demonstrates the perpetrator's potential for posing grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. (Penal Code § 3000, subd. (b) (1).) And the Legislature has clearly expressed its intent that when murderers – who are the great majority of inmates serving indeterminate sentences – approach their minimum eligible parole date, the Board 'shall normally set a parole release date.' (Pen.Code, §3041, subd. (a).) the Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is

> 'normally' to be granted. Otherwise, the Board's
> case-by-case rulings would destroy the proportionality
> contemplated by Penal Code 3041, subdivision (a),
> and also by the murder statutes, which provide
> distinct term of life without possibility of parole,
> 25 years to life, and 15 years to life for various
> degrees and kinds of murder. (Pen Code, § 190.et
> seq.)" (Ramirez, at p. 570. Therefore, to demonstrate
> "an exceptionally callous disregard for human
> suffering" (§(2402, subd. (c)(1)(D)), the offense in
> question must have been committed in a more aggravated
> or violent manner than that ordinarily shown in the
> commission of second degree murder.

(Id. at 891.)

In the instant action Petitioner was convicted of second

degree murder, although the Board may have properly found that

Petitioner's offense was committed with more than the necessary

force to convict him of second degree murder, Petitioner has

already served more than enough time to qualify him for parole

under the first degree murder offenses. In In re Rosenkrantz,

29 (2002) Cal.App 4th 616, Justice Moreno in the dissenting

opinion stated:

> Although I agree that evidence of premeditation and
> deliberation supports the conclusion that petitioner's
> crime was particularly egregious for a second degree
> murder, it is another matter whether any evidence
> would support the same conclusion for a first degree
> murder.. . Furthermore, petitioner's offense did not
> appear to partake of any of those characteristics
> that make an offense particularly egregious under
> the Baord of Prison Terms' parole eligibility matrix
> for first degree murders, e.g., torture, the
> inflicition of severe trauma not involving immediate
> death, or murder for hire. (Cal. Code Regs , tit.
> 15, § 2403, subd. (b).). . The significance of the
> above observations is this: there will come a point,
> which already may have arrived, when petitioner would
> have become eligible for parole if he had been
> convicted of first degree murder. Once petitioner
> reaches that point, it is appropriate to consider
> whether his offense would still be considered
> especially egregious for first degree murder in
> order to promote the parole statute's goal of
> proportionality between the length of sentence and
> seriousness of the offense.

(In re Rosenkrantz, supra, at 689-690).

In Rosenkrantz v. Marshall, that court noted Justice
Vogel's dissent (California Court of Appeas, Second District)
in a silent denial in 2004 after Rosenkrantz sought habeas
relief, (in the state court) Justice Vogel dissented,
explaining that since petitioner had by then served the minimum
sentence for first degree murder (a crime for which he was
acquitted) the Board should consider whether his offense was
especially egregious for first degree murder as opposed to a
second degree murder. Justice Vogel further stated that he
believed the petition should be grated because there was "no
evidence" supporting the Board's decision. (See Rosenkrants
v. Marshall, 444 F.Supp.2d 1063 fn. 6 (C.D. Cal.2006)).

The court in In re Lee, (2006) 49 Cal.Rptr.3d 931
(Cal.App. 2 Dist. 2006) stated that Lee's offense was not
particularly egregious although he shot and injured the
intended target, and killed the intended target's wife. The Lee
court further stated "yet, against two first degree murder
charges, his argument that his conduct involved no more than
the minimum acts needed to commit his offense would
strengthen. As such, he would have a stronger, not weaker,
claim to parole on two murder charges than he would for his
actual crimes of attempted premeditated murder and murder."

California Courts, interpreting the California parole
suitability guidelines, have found decisions to deny parole
unsupported by "some evidence" in cases where the petitioner
perpetrated the killing on facts much worse than this case. In
each case, the petitioner acted out of emotional stress or

7

other reasons that were more trivial than this case.

For example, In re Cooper, 62 Cal.Rptr. 92 (Cal.App. 1 Dist. 2007) Cooper killed his wife with a sledgehammer by hitting her in the neck five or six times at the least. She suffered for 20 to 30 minutes before she died. Cooper then hid the body and covered up his crime. Nonetheless, the court of appeal found that "some evidence" consistent with the California parole scheme did not support the decision denying suitability. Petitioner would point out that Petitioner's offense is comarable to Cooper's.

Petitioner would ask this Court to further compare with first degree murderer who were found suitable for parole.

In In re Elkins, 50 Cal.Rptr.3d 503 (Cal.App    Dist. 2006) that court held that the beating of the victim with a baseball bat in order to rob him did not constitute a particularly egregious murder. The appellate court held:

> The robbery drew a concurrent determinate term. Needlessly striking a robbery victim may, of course, show an especially heinous, atrocious or cruel robbery, but does not necessarily show an especially brutal first-degree murder.

(In re Elkins 50, Cal.Rptr.2d at p. 518).

In. In re Barker, (2007) 59 Cal.Rptr.3d 746 (Cal.App Dist. 2007) Barker was convicted of two counts of second-degree murder and one count of first-degree murder for his role in the killing of his friends' parents and grandfather. His friend shot his parents and Barker shot the grandfather, after first hitting him several times on the head with a chisel. Barker had been incarcerated for 29 years.

In In re Lawrence, 59 Cal.Rptr.3d 537 (Cal.App.2d Dist.

2007), Lawrence was convicted of first-degree murder after shooting her lover's wife five times, than stabbing her multiple times with a potato peeler. The appellate court found that the evidence did not support the parole denial finding Lawrence's offense was 'particularly egregious.' (Although Lawrence is under review, the Supreme Court rejected the appeal to stay Lawrence's release) Lawrence had been incarcerated for 26 years Petitioner's commitment offense does not automatically under him unsuitable for parole, especially parole should not have been denied parole for the fourteenth time.

The Board's reliance on the commitment offence to deny parole violates Petitioner's due process rights. The Board may rely on the commitment offense alone to deny parole, but the proposition must be understood. The commitment offense is a factor indicative of unsuitability Petitioner cannot change. In a recent decision the Board recognized that the "[e]vents and circumstances surrounding petitioner's crime are unchanging. . (I want to explain to you that no matter what happens in your lifetime, the crime is never going to change. **You understand that... That's always going to be there, period... [T]he crime is never going to change...**)" Sanchez v. Kane,444 F.,Supp.2d 1049, 1062.

Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair. (In re Smith (2003) 1'4 Cal.App 4th 343, 372, 7 Cal.Rptr.3d 655), and "runs contrary to the rehabilitative goals espoused by the prison system and could result i a due process violation." In re Scott, 133 Cal.App.4th 573, 595, (quoting

Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 917). The Scott, court further stated.; "The commitment offense can negate suitability only if circumstances of the crime reliably established by the evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet the predictive value of the commitment offense may be very questionable after a long period of time." (Scott, supra, at 595) (quoting Irons v. Warden of California State Prison- Solano (E.D. Cal. 2005) 358 F.Supp.2d 936, 947, fn.2 )

The Board s reliance solely on the commitment offense at this point, after 24 years, is no longer "some evidence" that will rationally support a finding that the public safety requires that he be found unsuitable for parole. Recently, the California Court of Appeals Sixth District, in its decision, in In re Weider, 52 Cal.Rptr.3d 147 (Cal.App. 6th Dist 2006) quoted Weider, stating:

> The court noted that Weider "has served so much time that, with custody credits, he is with in the matrix for first degree murder. . [I]t should be self evident that after an inmate has served the equivalent of 25 years, whether his actions were more than the minimally necessary for a second degree conviction.. is no longer the appropriate question [The Board's] position, that inmates who were only convicted of second degree may forever be denied parole based on some modicum of evidence that their acts rose to the level of a first, without acknowledging that fact that they have already served the time for a first, should be seen as so ridiculous that simply to state it is to refute it.

In Irons v. Carey, (9th Cir. 2007) 479 F.3d 658 the Ninth Circuit held that "indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his

10

rehabilitation, will at some point violate due process given the liberty interest that flows from the relevant California statutes." In Biggs v. Terhune, 334 F.32d 910, 916 (9th Cir. 2003) the Ninth Circuit held that a continued reliance in the future, on an unchanging factor, the circumstances of the commitment offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." The Court in Rosenkrnatz v. Marshall, 444 F.Supp.2d 1063 (C.D. Cal.2006), held:

> While relying upon petitioner's crime as a indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances -violates due process because petitioner s dozen parole suitability earings -violates due process because patitioner's commitment offense has become such a n unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard. After nearly 20 years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil."

(Rosenkrantz v. Marshall supra, at p. 1084.).

Our Supreme Court has noted that studies by psychiatrist have erred in predicting certain individuals as potentially violent, "thus branding as 'dangerous' many persons who are in reality totally harmless. [Citation]" (People v. Burnick (1975) 14 Cal.3d 306, 327 121 Cal.Rptr. 488, 535 P.2d 352.) A review of the statistics or recidivism rate of term to life prisoners who have been granted release is less than one percent. Petitioner is such a prisoner and therefore should be released.

The Board also stated that the commitment offense was trivial in relation to the offense and that Petitioner had an

11

opportunity to cease from committing the crime.

This type of construction of the factor has been condemned in the case law. "The reference in Board regulations to motives that are 'very trivial in relationship to the offense" therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more 'trivial') than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if prisoner is released than is ordinarily presented." (In re Scott (2004) 19 Cal.App.4th 871, 893.)

The Board further stated that Petitioner had an opportunity to cease from committing the crime. In In re Barker, supra, at 767 the Barker court held that the Board could not rely on the fact that Barker might have avoided killing to show his killing to be especially brutal (See Elkins, supra 144 Cal.App.4th at p. 497; 50 Cal.Rptr.3d 503).

## CONTENTION

### II.

#### THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS WHEN IT ARBITRARILY USED REGULATIONS WHICH CONTAIN INTOLERABLE VAGUE CRITERIA FOR DETERMINING UNSUITABILITY FOR PAROLE

Petitioner's parole suitability hearing was an arbitrary decision because it used intolerable vague criteria to determine Petitioner's unsuitability Our courts have recognized that the state and federal due process requirements dictate that the Board must apply detailed standards when determining whether a prisoner is unsuitable for parole on

public safety grounds. (In re Dannenberg, (2005) 34 Cal.4th
1061 at p. 1096, fn. 16). The standards are found in Cal. Regs.
§ 2402 (c):

    (1). Commitment offense. The prisoner committed the
        offense in an especially heinous, atrocious or
        cruel manner. The factors to consider include:

    (A). Multiple victims were attacked, injured or killed
        in the separate incidents.

    (B). The offense was carried out in a dispassionate and
        calculated manner, such as an execution-style
        murder.

    (C). The victim was abused, defiled or mutilated during
        or after the offense.

    (D). The offense was carried out in a manner which
        demonstrates an exceptionally callous disregard
        for human suffering.

    (E). The motive for the crime is inexplicable or very
        trivial in relation to the offense.

    The threshold question in a vagueness challenge is
"whether to scrutinize the statute for intolerable vagueness on
its face or whether to do so only as the statute is applied in
particular case." Schwartzmiller v. Gardner,752 F.3d 1341, 1345
(9th Cir. 1984). The Board has used all of the sections of
Cal. Regs., § 2402 "Determination of Unsuitability." The Board
has consistently used all the language contained in theses
statutes to deny Petitioner parole at the past fourteen parole
suitability hearings. The terms "especially heinous, atrocious
or cruel" do not render the factor unconstitutionally vague if
the crime fits within the criteria and serves as a basis for
the finding of unsuitability. The circumstances of the crime
must be more aggravated or violent than the minimum necessary
to sustain a conviction for that offense. (In re Rosenkrantz,

13

(2002) 29 Cal.4th 616, 682-683.) In such case the commitment offense alone can justify the denial of parole. (In re Dannenberg, supra, at p. 1095.) However, the Board has applied such language in an arbitrary and capricious manner throughout Petitioner's parole hearings, in light of the fact that Petitioner has maintained a exemplary behavior, therefore, this Court should grant habeas relief.

## CONTENTION

### III.

### THE SUPERIOR COURT DECISION WAS AN UNREASONABLE DETERMINATION OF FACTS, AND STATE AND FEDERAL LAW, IN LIGHT OF THE EVIDENCE PRESENTED

The Superior Court decision was an unreasonable[1] determination of State and Federal law in light of the evidence presented. The superior court stated that although it found that the Board's decision in April 2006 was ambiguous it was not the case in this 2007 Board's determination. The superior court stated that there was some evidence in the record. "Some evidence" does not literally mean 'any evidence'. The superior court judge must not have read the transcripts because nothing in the record shows that Petitioner does not remember parts of the crime. What Petitioner stated was that he does not recall taking any property from the victim. (See Exhibit "A" p. 83) Petitioner's offense was not robbery or burglary, it was a conviction for second degree murder.

Furthermore, if Petitioner's offense was particularly

1. See Exhibit "B" 2007 Superior Court decision.

14

egregious for a second degree murder as stated by the Board (See Exhibit "A" p. 79) Petitioner has already served more than the proscribed term set forth in the matrix for most aggravating term for first degree murder. Recently the California's Sixth Appellate District Court in In re Dannenberg, Case No. H030031 (11/16/07) stated:

> Our deferential standard of review, which requires us to credit the Governor's findings if they are supported by a modicum of evidence, does not mean that the fact that there is a modicum of evidence that a commitment offense was "especially heinous" will eternally provide adequate support for a decision that a prisoner is unsuitable for parole.

(Dannenberg, supra, at p. 10).

The Dannenberg court further stated:e

> "The regulations that govern the Board's and the Governor's, parole suitability decisions explicitly instruct that an unsuitability decision is a conclusion that "the prisoner will pose an unreasonable risk of danger to society if released from prison."(Regs, § 2402, subd. (a).)

(Dannenber, supra at p. 14.).

The Dannenberg court further stated that:

> [W]hile Dannenberg's commitment offense. was grave, the record that was before the governor lacks any evidence that now, more than two decades after his offense, the nature of Dannenbergs offense alone continues to support a conclusion that he poses an unreasonable risk of danger to society if released from prison.

(Dannenberg, supra, at p. 14.).

As the Dannenberg court stated, ("[C]onsequently, while there is some evidence that Dannenberg's commitment offense was "especially heinous,' when measured against the minimum elements of second degree murder, the Governor's decision violates due process because there is no longer any evidence

15

that solely due to the nature of Dannenberg's crime offense, he currently poses an unreasonable risk of danger to society. Dannenberg, supra, at p. 15) so Petitioner's offense after 26 years, though particularly egregious for a second degree murder, it is no longer evidence that Petitioner still poses a threat to public safety. Recently the federal court in Irons v. Carey, the Ninth Circuit Court of Appeals stated its "hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process. (See Irons v. Carey, 479 F.3d 658, 665 (9th Cir. 2007) The Ninth Circuit further held that Irons' due process was not violated when Irons was found unsuitable for parole prior to the expiration of his minimum term, given the particular circumstances (a particularly egregious offense) of the offense. (See Irons, supra, at p. 665.).

For the aforementioned reasons, the superior court decision was an unreasonable determination of state and federal law, given the evidence presented.

Dated: this $22$, of April 2008.

Claude Steele
**In Pro Se**

16

EXHIBIT     "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )       CDC Number C-34972
                          )
CLAUDE STEELE             )
_____    )


CALIFORNIA STATE PRISON

SAN QUENTIN, CALIFORNIA

July 23, 2007

4:25 P.M.


---

PANEL PRESENT:

Ms. Sandra Bryson, Presiding Commissioner
Ms. Deborah Star, Deputy Commissioner


OTHERS PRESENT:

Mr. Claude Steele, Inmate
Mr. Mike Gunning, Attorney For Inmate
Mr. Greg Cohen, Deputy District Attorney
Correctional Officer(s), Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No     See Review of Hearing
_____    Yes    Transcript Memorandum


**JEANNIE MOORS**

**FOOTHILL TRANSCRIPTION COMPANY, INC.**

INMATE

INDEX

Page

Proceedings ............................................... 1

Case Factors .............................................. 9

Pre-Commitment Factors .................................. 22

Post-Commitment Factors ................................. 34

Parole Plans ............................................ 41

Closing Statements ...................................... 69

Recess .................................................. 76

Decision ................................................ 77

Adjournment ............................................. 86

Transcriber Certification ............................... 87

--oOo--

1

                    P R O C E E D I N G S

    **DEPUTY COMMISSIONER STAR:** Okay, we're on record.

    **PRESIDING COMMISSIONER BRYSON:**  All right. This is

the 13th Subsequent Parole Consideration hearing for

Claude Steele, CDC number C-34972. Today's date is July

23, 2007. The time is 1625. We're located at San Quentin

State Prison. This inmate was received on the 27th of 1981

from (inaudible) County. The life term began August 27,

1981 with a minimum eligible parole date of December

1991, charging in Case number 3524, Count One controlling

offense, Penal Code 187 (inaudible) the weapon, a hammer,

for which the inmate received a term of 15 years to life.

This hearing is being recorded. For the purpose of voice

identification, each of us will state our first and last

name spelling our last name. (inaudible) comes up, you

spell your last name and please state your CDC number.  I

will start and move to my left. Sandra Bryson, B-R-Y-S-O-

N, Commissioner, Board of Parole Hearings.

    **DEPUTY COMMISSIONER STAR:**  Debbie Star, Deputy

Commissioner, Board of Parole Hearings.

    **DEPUTY DISTRICT ATTORNEY COHEN:**  Greg Cohen,

Tehama County District Attorney.

    **PRESIDING COMMISSIONER BRYSON:**  Will you spell

your last name (inaudible)?

    **DEPUTY DISTRICT ATTORNEY COHEN:**  I'm sorry. C-O-H-

2

1    E-N.

2         **ATTORNEY GUNNING:**  Mike Gunning -- excuse me -- G-

3    U-N-N-I-N-G. I'm the attorney for Mr. Steele.

4         **INMATE STEELE:**  Claude Junior Steele, S-T-E-E-L-E,

5    C-34972.

6         **PRESIDING COMMISSIONER BRYSON:**  Thank you. And

7    just for the record, we have two correctional peace

8    officers in the room (inaudible) security purposes.

9    (inaudible). Do you solemnly swear or affirm that the

10   testimony you will be sharing will be the truth, the

11   whole truth, and nothing but the truth?

12        **INMATE STEELE:**  Yes.

13        **PRESIDING COMMISSIONER BRYSON:**  Commissioner Star,

14   is there any confidential material in the file that

15   (inaudible) may be used today?

16        **DEPUTY COMMISSIONER STAR:**  There's confidential

17   material in the file, however, we will not be using

18   anything today.

19        **PRESIDING COMMISSIONER BRYSON:**  Now, I passed a

20   hearing checklist around to the attorneys to be sure that

21   we're all proceeding on the same set of documents,

22   (inaudible).

23        **ATTORNEY GUNNING:**  All those documents and the

24   psychological evaluation, 2007.

25        **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And,

3

1    I'd like to ask the District Attorney, (inaudible) the
2    documents with the checklist?
3         **DEPUTY DISTRICT ATTORNEY COHEN:** I did and I do
4    have those documents.
5         **PRESIDING COMMISSIONER BRYSON:** (inaudible) those
6    documents?
7         **DEPUTY DISTRICT ATTORNEY COHEN:** Yes, I do.
8         **PRESIDING COMMISSIONER BRYSON:** Thank you. Are
9    there any additional documents that (inaudible)?
10        **ATTORNEY GUNNING:** There are. (inaudible) do it
11   right now, or?
12        **PRESIDING COMMISSIONER BRYSON:** You can wait until
13   the appropriate time (inaudible).
14        **ATTORNEY GUNNING:** Okay. I'll just wait. Thanks.
15        **PRESIDING COMMISSIONER BRYSON:** All right. So we
16   just -- should we just leave this document? We're not
17   using that. (inaudible)
18        **INMATE STEELE:** ADA Statement.
19             "The Americans with Disabilities Act, ADA,
20             is a law. Disabilities are problems that
21             make it harder for some people to see, hear,
22             read, talk, walk, learn, think, work, or
23             take care of themselves than it is for
24             others. Nobody can be kept out of public
25             places or activities because of a

4

1         disability.  If you have a disability, you

2         have the right to ask for help to get ready

3         for your BPT hearing, get to the hearing,

4         talk, read forms and papers, and understand

5         the hearing process.  BPT will look at what

6         you ask for to make sure that you have a

7         disability that is covered by the ADA and

8         that you have asked for the right kind of

9         help.  If you do not get help or you don't

10        think you got the kind of help you need, ask

11        for a BPT 1074 Grievance Form.  You can also

12        get help to fill it out."

13        **PRESIDING COMMISSIONER BRYSON:**  (inaudible).

14        **INMATE STEELE:**  Yes.

15        **PRESIDING COMMISSIONER BRYSON:**  All right.  The

16   record reflects that on November 17th of 2006, you signed

17   a (inaudible) Form 1073.  (inaudible) request that

18   there's (inaudible) the American's with Disabilities Act.

19   Disability is defined under the ADA which shows that you

20   have no disability to identify (inaudible) that you have

21   (inaudible).  I noticed that you wear glasses.  So, do

22   they accommodate you for vision?

23        **INMATE STEELE:**  Yes.

24        **PRESIDING COMMISSIONER BRYSON:**  Okay.

25        **INMATE STEELE:**  The GPO lets (inaudible).

5

1        **PRESIDING COMMISSIONER BRYSON:**  Yes.

2        **INMATE STEELE:**  Actually, that's old.  The last

3    (inaudible).

4        **PRESIDING COMMISSIONER BRYSON:**  (inaudible) to the

5    record.  And then you go through (inaudible)?

6        **INMATE STEELE:**  Yes.

7        **PRESIDING COMMISSIONER BRYSON:**  Okay.  And you

8    also did include that in (inaudible).  Is that correct?

9        **INMATE STEELE:**  Yes.

10       **PRESIDING COMMISSIONER BRYSON:**  All right.  Is

11   there anything included the (inaudible) CNS or EOP

12   program?

13       **INMATE STEELE:**  No.

14       **PRESIDING COMMISSIONER BRYSON:**  All right.  Have

15   you ever taken psychotropic medication either in prison

16   or on the street?

17       **INMATE STEELE:**  No.

18       **PRESIDING COMMISSIONER BRYSON:**  Okay.  And do you

19   suffer from any disabilities you think might prevent you

20   from participating in today's hearing?

21       **INMATE STEELE:**  I'm a little nervous, but other

22   than that, I -- no.

23       **PRESIDING COMMISSIONER BRYSON:**  All right.  I'd be

24   nervous (inaudible).  (inaudible) concur (inaudible).

25       **ATTORNEY GUNNING:**  I do and just for the record, I

6

1    have an updated 1073 which is March 22nd, '07.   Same

2    thing, just a new date.   That's all.

3         **PRESIDING COMMISSIONER BRYSON:**   Okay.   Is that

4    correct?   Did you (inaudible)?

5         **ATTORNEY GUNNING:**   Yes, ma'am.   (inaudible).

6         **PRESIDING COMMISSIONER BRYSON:**   Oh, okay.

7         **ATTORNEY GUNNING:**   (inaudible).

8         **PRESIDING COMMISSIONER BRYSON:**   (inaudible).   He

9    says its --

10        **INMATE STEELE:**   Well, yeah.   The last thing we did

11   was (inaudible).

12        **DEPUTY COMMISSIONER STAR:**   (inaudible).

13        **PRESIDING COMMISSIONER BRYSON:**   So you probably

14   think that (inaudible).

15        **DEPUTY COMMISSIONER STAR:**   (inaudible).

16        **PRESIDING COMMISSIONER BRYSON:**   This hearing is

17   being conducted pursuant to Penal Code Sections 3041 and

18   3042 and the rules and regulations of the Board of Parole

19   Terms that govern parole consideration hearings for life

20   inmates.   The purpose of today's hearing is to consider

21   your suitability for parole.   In doing so, (inaudible)

22   files (inaudible) your prior criminal and social history

23   (inaudible). The Panel has had the opportunity to review

24   your Central File. You will be given an opportunity to

25   correct or clarify (inaudible).   The Panel will consider

1    your progress since your conviction, counselors

2    (inaudible) psychological reports, and any other relevant

3    information. Any change in parole plans should be brought

4    to the Panel's attention.  The Panel will reach a

5    decision today and inform you whether or not it finds you

6    suitable for parole and reasons for its decision.  If

7    you're found suitable for parole, the length of your

8    confinement will be explained to you.  Nothing that

9    happens here today will change the findings of the court.

10   The Panel is not here to retry your case.  The Panel is

11   here for the sole purpose of obtaining your suitability

12   for parole.  Do you understand?

13           **INMATE STEELE:**  Yes.

14           **PRESIDING COMMISSIONER BRYSON:**  This hearing will

15   be conducted in three phases.  I will discuss with you

16   the crime for which you were committed with criminal

17   (inaudible).  Commissioner Star will discuss with you

18   your progress since you've been (inaudible) counselors

19   report and your psychological evaluation. I will then

20   discuss with you your parole plans and any letters of

21   support (inaudible) in your file.  Once that is

22   completed, (inaudible) the District Attorney and your

23   attorney will be given the opportunity to ask you

24   questions.  Questions from the District Attorney shall be

25   asked to the chair and you'll direct your answers to the

8

1    Panel.   Next, the District Attorney and then your

2    attorney and then you will be given the opportunity to

3    make a final statement regarding your parole suitability.

4    Your statement should address why you feel you are

5    suitable for parole.   The Panel will then recess for

6    (inaudible) deliberations.   Once the deliberations are

7    completed, the Panel will resume the hearing and

8    (inaudible).   The California Code of Regulations states

9    that regardless of time served, a life inmate should be

10   found unsuitable for and denied parole if in the judgment

11   of the Panel, the inmate would pose an unreasonable risk

12   of danger to society if released from prison.   You have

13   certain rights.   Those rights include the right to a

14   timely notice of this hearing.   Were you given timely

15   notice of this hearing?

16           **INMATE STEELE:**   Yes, I was.

17           **PRESIDING COMMISSIONER BRYSON:**   The right to

18   review your Central File.   I believe that you did review

19   your Central File November 17th of 2006.   This was some

20   time ago.   But you did review it, which is a good thing.

21   And the right to present relevant documents which you

22   were given the opportunity to (inaudible) today.   You

23   also have a right to be heard by an impartial Panel.   Do

24   you have any evidence to show that the Panel before you

25   today is (inaudible)?

9

1          **INMATE STEELE:**  No.

2          **PRESIDING COMMISSIONER BRYSON:**  You will receive a

3    copy of today's written tentative decision today. That

4    decision will become effective within 120 days. This also

5    is subject to review by the Governor.  A copy of the

6    tentative decision and a copy of the transcript will be

7    sent to you.  The Board has eliminated its appeal

8    process. If you disagree with anything (inaudible), you

9    have the right to go directly to the court to

10   (inaudible).  You are not required to admit the offense

11   or discuss the offense. However, this Panel does except

12   (inaudible) findings of the court and you are invited to

13   discuss the facts and circumstances (inaudible) if you

14   decide.  The Board will review and (inaudible) any prior

15   statements you've made regarding the offense to determine

16   your suitability for parole. So basically, (inaudible).

17   Council, are there any preliminary objections.

18         **ATTORNEY GUNNING:**  There are not.

19         **PRESIDING COMMISSIONER BRYSON:**  Okay.

20   (inaudible).

21         **ATTORNEY GUNNING:**  Yes.

22         **PRESIDING COMMISSIONER BRYSON:**  (inaudible) facts

23   (inaudible) was set forth in the probation officer's

24   report as to the present offense beginning on Page 3.

25         "On February 1, 1981, (inaudible) a.m.

10

| | |
|---|---|
| 1 | while (inaudible) Tehama County Sheriff's |
| 2 | Deputy issuing a citation to the above named |
| 3 | defendant for failure to stop at a stop |
| 4 | sign.  The defendant started crying saying |
| 5 | 'I killed him.  I know I killed him.'  The |
| 6 | officer then advised the defendant his |
| 7 | rights for Miranda.  And after the defendant |
| 8 | waived his rights, the officer asked him |
| 9 | what he meant.  The defendant then replied, |
| 10 | 'I killed him.  I don't remember all of it. |
| 11 | I keep getting flashbacks, but I know I |
| 12 | killed him.  I went out drinking with some |
| 13 | friends and then I went to the guy's house. |
| 14 | He was queer.  He made a pass at me, so I |
| 15 | killed him.  I killed him with a hammer.' |
| 16 | The defendant was then placed under arrest |
| 17 | for suspicion of murder.  And the defendant |
| 18 | then directed the officer to the victim's |
| 19 | home on Lakeside Drive in Red Bluff.  The |
| 20 | residence is in the city of Red Bluff. |
| 21 | Therefore, the Red Bluff police department |
| 22 | was notified and then took over the |
| 23 | investigation.  Inside the residence on |
| 24 | Lakeside Drive, the officers found the |
| 25 | victim, Clarence Russell Baldwin, lying in |

11

1           bed with massive head injuries.  He appeared
2           to be deceased and the officer could not get
3           a pulse, but he was still warm to the touch.
4           The officers then called for an ambulance
5           and a coroner.  When the coroner arrived at
6           the scene, he pronounced the victim dead."
7     So this is a terrible crime and others have been in
8     unfortunate situations where they received advances from
9     someone that they did not know.  What makes this
10    different from (inaudible).  Can you tell us?
11          **INMATE STEELE:**  (inaudible).
12          **PRESIDING COMMISSIONER BRYSON:**  Maybe we better
13    get started from the beginning of the crime.
14          **INMATE STEELE:**  Okay.  What happened was I was
15    down at the park with a (inaudible).  (inaudible) asked
16    me if I wanted to go and stay at his house (inaudible)
17    party.  I said yes because at the time, I was homeless.
18    We hung out at the park for a couple hours and I'm
19    guessing at around 5 o'clock in the afternoon, we started
20    walking through the park to (inaudible) at the corner.
21    And there was a man that the -- that -- he had worked
22    (inaudible).  He was there.  He had his trunk open and
23    his music going.  And I asked where he was going and
24    asked us if we were (inaudible).  Of course, we said yes.
25    I guess -- I'm not sure how long we were there with him,

12

1    but I believe Leonard said that he had been on

2    (inaudible) where his (inaudible). And Mr. Baldwin told

3    us to -- wanted to give us a ride, come over to his

4    house. I think he said he had (inaudible), I'm not sure.

5    So, we jumped in Mr. Baldwin's car, went to his house,

6    and we proceeded to drink for a couple hours and Mr.

7    Baldwin, I think went and maybe showered. I guess it was

8    probably getting around 7:30, 8 o'clock at night. And we

9    decided to head to the corner. And we got as far -- we

10    went to the corner, but we couldn't find the party. And

11    I'm thinking we drove around for probably close to an

12    hour and we stopped and Mr. Baldwin bought a case of

13    beer. I think we drank most of the beer until we found

14    some people there that were on their way to the party.

15    And on the way to the party, the -- I said something to

16    him. I looked at Leonard and Leonard had a weird look on

17    his face and kind of motioned down with his head and I

18    looked down and Mr. Baldwin had his hand on Lenny's leg.

19    And -- you know -- we really had to say too much about

20    it. We got to the party where Mr. Baldwin dropped us

21    off. I -- I'm guessing probably around maybe 9:30, 10

22    o'clock and we went in and we started drinking. And I'm

23    guessing about maybe 30 minutes later, I hadn't seen

24    Larry in a while and I asked the guy (inaudible) said he

25    was and he said yes, that we going to (inaudible). And

13

1   so I was sitting on the couch, no place to go. Didn't
2   know anybody there.  And Mr. Baldwin came and sat down
3   beside me.  And we got to talking.  And I'm really not
4   sure about the time. Maybe 10:30.  And I don't remember
5   the whole conversation, but -- really not any of it.  But
6   anyway, he said that he was going to leave, because he
7   came back to the party.  He had left and came back.  And
8   I asked him -- early -- what I'd left out was earlier
9   when we were at his house, he had told me and Leonard if
10  we ever needed a place to stay, come and see him.  So I
11  asked him if the offer was still open for a place to
12  stay.  And he said yes.  So, we got in his car, went back
13  to Red Bluff.  I guess we got there at probably around
14  10:45, 11 o'clock.  He showed me where I was going to
15  stay.  And -

16          **PRESIDING COMMISSIONER BRYSON:**  Which was where?
17          **INMATE STEELE:**  He had a spare bedroom.  He had
18  another bedroom.  He told me to -- that he had to get up
19  early to go to work, so fold up the blankets and he'd see
20  me another day.  So I said, okay, thank you.  And that
21  was pretty much the conversation.  I went back into his
22  living room and sat on I think it was a couch.  I was
23  listening to his stereo.  I took off my shoes and I think
24  my shirt.  And a few minutes later, I sensed something
25  and I turned around and Mr. Baldwin was standing there in

14

1    just his t-shirt.  And he told me, "Are you ready?"  And
2    I -- well, I'm leaving a lot of stuff out.  I had came to
3    the conclusion that Mr. Baldwin was homosexual or there
4    was something different about him.  And I told him, "Hey,
5    you know, I ain't like that."  And he didn't say nothing.
6    He turned around and walked back into his room.  I put on
7    my pants, I think, and my shirt and my shoes and I was
8    out of there.  I got to the door and Mr. Baldwin said,
9    "Hey, come here."  And -- worst mistake I ever made.  I
10   stopped and I walked up to his door and I stepped in and
11   right next to his bed and I said, "What?"  And he reached
12   up with his left hand and he grabbed me in the crotch
13   area and he told me he wanted to suck my dick and lick my
14   asshole.  Freaked me out.  I see a hammer.  I grabbed it
15   and for many years, I only remember hitting him one time,
16   But I remember hitting him almost every time (inaudible).
17   I --

18            **PRESIDING COMMISSIONER BRYSON:**  So, now he's not
19   (inaudible)?

20            **INMATE STEELE:**  Yeah.  I started remembering about
21   10 years ago.  Before, I remember hitting him one time
22   and then standing over him.  I --

23            **PRESIDING COMMISSIONER BRYSON:**  What do you
24   (inaudible) that there just happened to be hammer?  I
25   mean people normally don't have --

15

1        **INMATE STEELE:**  Well --

2        **PRESIDING COMMISSIONER BRYSON:**  -- hammers in

3    their (inaudible).

4        **INMATE STEELE:**  Well, I've had other board members

5    ask.  You know, I don't know -- he was -- you know --

6    tapping (inaudible) picture over his bed.  It was there.

7    Unfortunately.  The item was there.  I --

8        **PRESIDING COMMISSIONER BRYSON:**  It never crossed

9    your mind just to run out of there?  Because you were

10   running out at some point.

11       **INMATE STEELE:**  I wasn't -- I was -- when I went

12   in there -- you know -- I was embarrassed, you know,

13   (inaudible).  It came to me -- you know -- everything

14   that had been going on with this guy -- what he brought

15   me back for.  And I was embarrassed and I was angry.  I

16   mean, I was angry back at that time.  You know --

17   (inaudible), I went ahead and (inaudible), I never went

18   in there with intent to kill Mr. Baldwin or anything like

19   that.  It's just when he grabbed me, it just freaked me

20   out.  And I exploded.  I killed a man.  I walked into his

21   bathroom.  I remember letting handle on the sink and

22   tried washing my face.  And the next thing I know, I was

23   being pretty much pulled over by, I don't know if it was

24   highway patrol or the police.  But he pulled me over and

25   I had the hammer in the front seat of the car.  He asked

16

1    me to get out.  I got out and I'm pretty sure they had me
2    perform some drunk test and what happened next is pretty
3    blurry, but I remember telling him that I thought I'd
4    killed somebody and he had me down, put handcuffs on me,
5    read me my rights, and pretty much after that, I don't
6    remember too much.  I know they took me to the hospital.
7    I sort of remember that where I waited (inaudible) level
8    (inaudible).  In the cell, on the radio, there was --
9    back then they had a radio in there -- it said that I was
10   suspected of bludgeoning (inaudible) Russell Baldwin.
11          **PRESIDING COMMISSIONER BRYSON:**  (inaudible) how
12   many times you hit him?
13          **INMATE STEELE:**  I hit him a lot of times.  I --
14          **PRESIDING COMMISSIONER BRYSON:**  Did he fight you?
15          **INMATE STEELE:**  I don't remember.  I don't think
16   so.  I mean, I remember hitting him and I remember him
17   putting his hands up.  I really don't remember him saying
18   anything.
19          **PRESIDING COMMISSIONER BRYSON:**  He put his hands
20   up, so he was trying to get you stop.  Is that what you
21   think?
22          **INMATE STEELE:** Yeah.
23          **PRESIDING COMMISSIONER BRYSON:**  How big a man was
24   he?
25          **INMATE STEELE:**  I don't know.  I think maybe

17

1    around the same size as me maybe.

2         **PRESIDING COMMISSIONER BRYSON:**  When you left, did

3    you think he was dead then or do you remember?

4         **INMATE STEELE:**  I remember when -- the last time I

5    hit him, I was standing there and he took a breath and

6    blood came out of his nose.  And I stopped.  I was pretty

7    sure he was dead.  I -- actually I was probably

8    (inaudible).  That was one thing I couldn't remember.

9         **PRESIDING COMMISSIONER BRYSON:**  Were you under the

10   influence of anything besides alcohol that night?

11        **INMATE STEELE:**  No.

12        **PRESIDING COMMISSIONER BRYSON:**  Do you have a

13   history of poly-substance abuse or just alcohol?

14        **INMATE STEELE:**  I smoked a lot of marijuana and I

15   did a little acid, but I quit most of that seven or eight

16   months before I went -- I'd -- maybe about seven or eight

17   months.  I probably stopped I think about April or May

18   (inaudible).

19        **PRESIDING COMMISSIONER BRYSON:**  (inaudible).  I'm

20   going to ask Commissioner Star if there's any questions

21   about the (inaudible)?

22        **DEPUTY COMMISSIONER STAR:**  I do.  Thank you.  How

23   much did you drink?

24        **INMATE STEELE:**  I'd pretty much been on a drunk

25   for about six months.

18

1     **DEPUTY COMMISSIONER STAR:** That day, do you
2     recall?

3     **INMATE STEELE:** I'd been drinking throughout the
4     day and when he picked us up, I'm not sure how much I
5     drank with him and at his house. And I know he bought a
6     case of beer on the way to the party and we pretty much
7     consumed all that, the three of us. And I drank some at
8     the party. And I'm not sure if I drank back at his house
9     or not.

10    **DEPUTY COMMISSIONER STAR:** You said the police
11    gave you some tests. Did they do a breathalyzer or urine
12    test or anything or drug that you know of?

13    **INMATE STEELE:** I don't know if we did a -- the --
14    I'm pretty sure they had me -- you know -- stand and
15    things and I know they gave me a breath tested positive.
16    So I don't know if you have the breathalyzer (inaudible).

17    **DEPUTY COMMISSIONER STAR:** Okay. Where was the
18    hammer after you bludgeoned him? Was it -- I mean
19    (inaudible).

20    **INMATE STEELE:** I carried it with me.

21    **DEPUTY COMMISSIONER STAR:** Was it on your person
22    when they arrested you?

23    **INMATE STEELE:** It was in the front seat of the
24    car.

25    **DEPUTY COMMISSIONER STAR:** And whose car was it?

19

1          **INMATE STEELE:**  Mr. Baldwin's.

2          **DEPUTY COMMISSIONER STAR:**  And why did you take

3    his car?

4          **INMATE STEELE:** I, to this day, do not remember

5    taking his car.  I was in it.  I know I took it, but I

6    mean, I don't remember taking it.

7          **DEPUTY COMMISSIONER STAR:**  How did you start it?

8    Did you have his keys?

9          **INMATE STEEL:**  Well, I had the keys.

10         **DEPUTY COMMISSIONER STAR:**  Do you know where you

11   got the keys?

12         **INMATE STEELE:**  I don't know if they were left in

13   the car or -- he said that house had been gone over.

14         **DEPUTY COMMISSIONER STAR:**  Do you recall that?

15         **INMATE STEELE:** No.

16         **DEPUTY COMMISSIONER STAR:**  Did you have any other

17   personal belongings of his?

18         **INMATE STEELE:**  They said I took his stereo

19   speakers and I had to have because I had been listening

20   to them on -- in the house (inaudible) as well --

21   listening to the stereo.

22         **DEPUTY COMMISSIONER STAR:**  Were they in the car?

23         **INMATE STEELE:**  They were in the car.  I had took

24   them.

25         **DEPUTY COMMISSIONER STAR:**  Did you have his

20

1    wallet?

2        **INMATE STEELE:**  He said there was a wallet in the

3    car.

4        **DEPUTY COMMISSIONER STAR:**  Okay.  And Mr. Steele,

5    your statement is you were quite angry of his homosexual

6    -- you know -- approach -- approaching of you.  However,

7    the finding of his property in your -- on your person

8    appears to be that there might have been other criminal

9    offense.  Did you have intent to rob him?

10       **INMATE STEELE:**  I was there with the sole intent

11   of having a place to live -- I mean not live but stay.  I

12   was there.  I had been staying for about the last four or

13   five weeks with my brother in an abandoned house.

14       **DEPUTY COMMISSIONER STAR:**  You're -- you told

15   Commissioner that he had earlier approached your friend.

16   ·    **INMATE STEELE:**  In the car.

17       **DEPUTY COMMISSIONER STAR:**  So, you -- did -- you

18   knew then that he may have been homosexual at that point?

19       **INMATE STEELE:**  Yeah.  Well, we -- when he left

20   and drop us off, he said -- you know -- (inaudible).  So

21   what.  I mean I had --

22       **DEPUTY COMMISSIONER STAR:**  You weren't offended

23   then?  You were offended later?

24       **INMATE STEELE:**  Well, I think later was

25   (inaudible) he was kind of funny, yes.  I'd never been in

21

1    on anything like that and I mean I -- he sat down beside

2    me and there was never anything said -- you know -- like

3    (inaudible) bring him back to the house in order to have

4    sex with you or anything like that.  (inaudible).  I was

5    only thinking about a place to stay (inaudible).

6         **DEPUTY COMMISSIONER STAR:**  Where were you headed

7    when you left?

8         **INMATE STEELE:**  Excuse me?

9         **DEPUTY COMMISSIONER STAR:**  Where were you headed

10   when you left the residence?

11        **INMATE STEELE:**  I have no idea.  Like I said, I

12   don't remember taking the car or anything like that.  I

13   know that when I came out of a blackout, I was at the

14   fairgrounds and I was outside the car and they were

15   counting down New Years and next thing I know, I was

16   sliding out across from the police (inaudible).  The

17   lights were on me.  They pulled me over.

18        **DEPUTY COMMISSIONER STAR:**  The hammer that you

19   used -- where did -- where was it?  Where did the victim

20   have it at (inaudible)?

21        **INMATE STEELE:**  It was on his nightstand.

22        **DEPUTY COMMISSIONER STAR:**  Was the victim standing

23   or seated on the bed?

24        **INMATE STEELE:**  He was laying down.

25        **DEPUTY COMMISSIONER STAR:**  Laying down?

22

1          **INMATE STEELE:**   Yeah.

2          **DEPUTY COMMISSIONER STAR:**   You were standing --

3          **INMATE STEELE:**   Yes.

4          **DEPUTY COMMISSIONER STAR:**   -- over him.

5          **INMATE STEELE:**   I was standing.

6          **DEPUTY COMMISSIONER STAR:**   Any other property

7    besides the stereo speakers and wallet and his car?

8          **INMATE STEELE:**   I don't remember.  There -- they

9    said there was like a Stuff screwdriver case or something

10   like the stuff that was in his car.  I don't remember.

11   He said that they think I did that, but I don't know.  I

12   don't remember.

13         **DEPUTY COMMISSIONER STAR:**   Did you have money on

14   you?

15         **INMATE STEELE:**   No.  I didn't have any money.

16         **DEPUTY COMMISSIONER STAR:**   I think that's all the

17   questions.  Thank you.

18         **PRESIDING COMMISSIONER BRYSON:**   I want to approach

19   this now from the -- your history. (inaudible) walking

20   around in the first place.  But let's talk first about

21   your juvenile record.  You first came under the ward ship

22   of the (inaudible) County Probation Department when you

23   were 13 years old.  (inaudible) was filed (inaudible) you

24   served 12 days in juvenile custody then were released to

25   your parents.  Do you remember that?

23

1          **INMATE STEELE:** Sort of.  It's -- that was I think
2     like '75 or '76.

3          **PRESIDING COMMISSIONER BRYSON:**  Yes.  What did you
4     take (inaudible)?

5          **INMATE STEELE:**  (inaudible).

6          **PRESIDING COMMISSIONER BRYSON:**  (inaudible).

7          **INMATE STEELE:** I think I stole her (inaudible).

8          **PRESIDING COMMISSIONER BRYSON:**  Okay.  From
9     February 25th at the age of 18 of 1977, you received four
10    more sustained juvenile petitions for (inaudible)
11    resisting arrest (inaudible) the County juvenile facility
12    and damaging a place of confinement.  And you were sent
13    to CYA for a 90-day evaluation and were returned to
14    juvenile custody for 30 more days (inaudible) then you
15    were placed in a foster home.  Let me just elaborate on
16    that.  On December 21st of 1977, you received a commission
17    of malicious mischief and you were remanded to Fox
18    Springs Boys Ranch and returned the next day to juvenile
19    authority since you vowed to escape from the ranch and
20    you remained in juvenile custody until your sentence to
21    CYA on March 6th of 1978.  And you paroled from CYA on
22    December 2nd of 1978.  Is that accurate?

23         **INMATE STEELE:** Yeah.

24         **PRESIDING COMMISSIONER BRYSON:**  All right.  You
25    were born to Claude and Shirley Steele, the youngest of

1   eight children.  That's a big family.

2       **INMATE STEELE:** Yes.

3       **PRESIDING COMMISSIONER BRYSON:**  You were -- you

4   moved to Red Bluff (inaudible) county when you were 1

5   year old, continued to be raised by your parents until

6   1977 when incidentally enough, that's when you were in

7   all this trouble.  By 13, your parents were having

8   trouble controlling you and you disliked your mother as

9   an authoritarian figure.  So, how were you socialized at

10  your early age?  Were you -- how were you socialized in

11  your home lives then?  It sounds like it was pretty

12  chaotic.

13      **INMATE STEELE:**  Well it was pretty normal up

14  until, I don't know, I guess I was 12 or 13 when we'd --

15  we (inaudible).  We'd been living across the road

16  (inaudible).  I -- my brother took me out and let me

17  drink a couple of beers with him and that's pretty much

18  when I (inaudible).

19      **PRESIDING COMMISSIONER BRYSON:**  (inaudible).

20  Okay.  You disliked your mother as an authoritarian.

21  Your parents separated in November of 1977 and eventually

22  divorced in 1978.  Was there a lot of argument at home

23  (inaudible)?

24      **INMATE STEELE:**  No.  There wasn't a lot of it.  My

25  parents had -- my mom was I think like 13 or 14 when she

25

1    married my dad.  My dad's like 20.  Back in Arkansas.

2         **PRESIDING COMMISSIONER BRYSON:**  I see.

3         **INMATE STEELE:**  And she had all of us in a 11 year

4    period, all eight of us.  And mom was -- she wanted to

5    throw her oats.  She -- they stayed together pretty much

6    for me and my sister, my sister DeDe, until I had started

7    really screwing up and going to YA and -- so I wasn't

8    there and my sister was a lot more mature than I was and

9    mom (inaudible).

10        **PRESIDING COMMISSIONER BRYSON:**  Okay.  And so, did

11   she remarry again?

12        **INMATE STEELE:**  Yes, she did.

13        **PRESIDING COMMISSIONER BRYSON:**  How are they

14   doing?

15        **INMATE STEELE:**  She was very happily married until

16   (inaudible).  She died.

17        **PRESIDING COMMISSIONER BRYSON:**  I'm sorry.

18        **INMATE STEELE:**  Yeah.

19        **PRESIDING COMMISSIONER BRYSON:**  That's of this

20   year?

21        **INMATE STEELE:**  Yeah.

22        **PRESIDING COMMISSIONER BRYSON:**  Oh, I'm sorry.

23   How about your siblings?  Do you keep in contact with

24   them?

25        **INMATE STEELE:**  I'm -- my two older sisters died

26

1    in the last five years.  I'm in contact main -- well

2    wither everybody except my sister, Amber.  Mostly in

3    contact with my sister Janet and my sister DeDe.  But my

4    brother Jesse -- sometimes I hear from my brother

5    (inaudible).

6         **PRESIDING COMMISSIONER BRYSON:**  How are they all

7    doing?  Is anybody else (inaudible) the law?

8         **INMATE STEELE:** Yeah.  My brother Jesse.  He's been

9    in a lot of trouble, but he's this close to being off

10   parole.  He was living with my mom the last couple years

11   taking care of (inaudible).  She (inaudible) emphysema

12   and lung cancer (inaudible).  That was (inaudible) of

13   that.

14        **PRESIDING COMMISSIONER BRYSON:**  How about your

15   father?  Have you had (inaudible)?

16        **INMATE STEELE:** And my dad.  Yeah.  I call him

17   every week.  He's is Pine Hills.

18        **PRESIDING COMMISSIONER BRYSON:**  Okay.  How's he?

19        **INMATE STEELE:** Pop's 80, but he's doing really

20   well.

21        **PRESIDING COMMISSIONER BRYSON:**  It says that you

22   were a poor student in grammar school, often truant and

23   shy by nature.  In 1977, again, that same year after

24   going to CYA, you were going to continuation school

25   (inaudible) 18, but you didn't graduate or received a

1    GED.  You were in Special Ed.  You've never been married,
2    no psychiatric issues.  You worked at odd jobs, tried
3    several positions in State run programs, but you quit
4    after several days and then it talks about your substance
5    abuse.  So, basically when you committed this crime, you
6    were 18.  So basically, you didn't have a lot of
7    experience that was work related.  I guess what I'm
8    wondering about is you said that were basically homeless
9    at the time of this commitment offense.  You were going
10   to go to a party on -- how would you explain what your
11   lifestyle was?  Were you just on the loose at that point?
12   How did you make money to live?

13         **INMATE STEELE:**  I got it from my parents and
14   brothers and sisters and got to the point where they
15   didn't want to give it to me anymore, so I started taking
16   it and that's when my dad kicked me out, my mom kicked me
17   out, my sisters kicked me out, (inaudible) kicked me out
18   and over about a six month period, that's when
19   (inaudible) staying with my brother in (inaudible).  I
20   think I might have got lost what was asked of me.

21         **PRESIDING COMMISSIONER BRYSON:**  Just trying to --
22   that was good.  I was trying to find out why you were in
23   the state you were in whenever this happened (inaudible).
24   It sounds as though you were pretty reckless and without
25   any footing at all at that part.  You said you were

28

1   almost --

2           **INMATE STEELE:** I --

3           **PRESIDING COMMISSIONER BRYSON:** Did you have a job
4   at all?

5           **INMATE STEELE:** No. I think I had one job when I
6   was like maybe 17 in the city program that lasted for
7   about three hours. I wasn't -- I had -- was a kid. I
8   would work and made money and did stuff like that, but
9   when I -- things changed when I was about 13 when we
10  lived in Red Bluff. That's when I started -- I was
11  really shy. I didn't have a whole bunch of friends. And
12  everything was pretty normal at home. And I drank some
13  beers with my brother one day and -- you know --
14  everything was different. I was real talkative and I was
15  embarrassed to talk with other people. And I became real
16  talkative and -- you know -- I thought that was the thing
17  for me. Hang out with my brother at the park drinking
18  beer. Hanging out with people. And that's when things
19  were going bad with my mom and I quit school. It was all
20  about drinking beer and partying with my brother.

21  (inaudible).

22          **PRESIDING COMMISSIONER BRYSON:** What was your
23  thought for the future? Did you have any kind of plan of
24  where you were going or --

25          **INMATE STEELE:** My only though was where the next

29

1    party was going to be and if I was invited.  And I was at
2    home simply for a place to live and eat (inaudible).  All
3    I thought about was hanging out.

4         **PRESIDING COMMISSIONER BRYSON:**  Did you -- would
5    you characterize yourself as angry at the time?  Did you
6    have any anger (inaudible)?

7         **INMATE STEELE:**  I was -- got angry really I guess
8    when we -- about the time I started getting in trouble.
9    For a year, I hung out with my brother and I was accepted
10   by all his friends.  My brother's like 10 years older
11   than me.  You know what I'm saying.  I was 13-14 and
12   hanging out with people in their early 20s.  And it was
13   all good.  It was fun.  Everybody though I was cool.  And
14   then my brother put on his backpack and left.  And I went
15   down to hang out with those same people and found out
16   that the only reason I was cool and all that was because
17   my brother was there.  My brother was a real -- he was a
18   big guy, big voice and I seen how many people looked up
19   to him and things like that.  And when he left, I found
20   out that he was a big guy with a big voice and he was a
21   bully and the only reason I was being accepted is because
22   he was there.  And all of a sudden, people didn't want me
23   around.  I didn't want to go to school.  I wanted to be
24   with them and the only way they wanted me around is if I
25   had beer or had money to buy beer.  So, I went out and

30

1   started going to the stores and stealing hard liquor and

2   things like that.  When I had it, I was accepted.  When I

3   didn't, then I wasn't (inaudible).  Then I started doing

4   lots of stupid things, breaking windows, things like

5   that.  And they sent me to YA twice.  I -- when I got

6   out, I went to live with my dad in Jackson and things

7   were okay, but it wasn't the people that I wanted to be

8   with, so I started screwing up and taking my dad's car in

9   the middle of the night and going to Red Bluff.  And

10  that's (inaudible) on about I guess on the fourth or

11  fifth occasion, I -- I'm getting ahead of myself.  One

12  day, I had some clarity and I went and joined the Job

13  Corps.  My dad and my parole officer at the time from YA,

14  Ron Wilson, I think his name was, they got together and

15  got me accepted.  And they took me there.  And as much as

16  I didn't want to do it, I did it and found out it was

17  dorms and at the time, I was a serious bed wetter and

18  there just wasn't no way that I was going to stay in a

19  dorm.  So I took off the next day and when my dad got

20  back from work, I guess he was sitting on the couch and

21  one lady was there (inaudible) and a couple days later, I

22  came back from being somewhere and my dad, my uncle Buddy

23  and my dad's brother and his two sons were there and my

24  dad had my little backpack and he said, "You're out of

25  here.  I don't want you around.  Bye."  And we said -- I

1    had some bad words and I left and went to Red Bluff and

2    --

3        **PRESIDING COMMISSIONER BRYSON:** So that time, you

4    were not able to establish any communication really with

5    your father, it doesn't sound like. Is that correct?

6        **INMATE STEELE:** Yeah. It was all about -- you

7    know -- feed me and give me money. And --

8        **PRESIDING COMMISSIONER BRYSON:** Did he understand

9    some of the -- for example, the bed wetting (inaudible) -

10   - did he understand some of the problems you were trying

11   to deal with? Or did he know about any of them?

12       **INMATE STEELE:** I -- well the bed wetting part,

13   yeah. I mean it wasn't no secret (inaudible). I -- me

14   and my dad never really had a lot of -- you know -- in

15   depth conversation about my (inaudible). Because all he

16   knew were -- that time I was up there, especially the

17   last six months I was there was -- you know -- I pretty

18   much took control of my dad and my step mom's life,

19   coming and going wherever I wanted until he finally got

20   with his brother and my cousins and told me to head on

21   down the road. So, I went to Red Bluff I'm think about

22   in June of 1980 and me and my mom -- you know -- we

23   didn't have the greatest relationship, but when I -- ever

24   I came, she let me stay until I started screwing up and

25   this time I stayed with her for a couple weeks, then I

32

1    stole from her and came and went. And she told me you

2    can come here and eat and shower, but you're not staying

3    here. So, I said some bad things to her and went to my

4    sister's and my other sister's and my aunt's and the few

5    people that I knew and --

6         **PRESIDING COMMISSIONER BRYSON:** Did they try to

7    counsel you -- some of your family? Did they

8    (inaudible)?

9         **INAMTE STEELE:** Yeah. They said -- you know --

10   get a job. Do something. What are you doing? And I

11   said, I'm doing what I'm doing. What do you do? This is

12   what I do. And I wasn't listening. And so probably

13   about late November, early December, my brother came in

14   to town and he wasn't the biggest guy anymore and not as

15   popular as I though and me and him found a homestead at

16   abandoned house by the bus depot for about maybe four or

17   five weeks.

18        **PRESIDING COMMISSIONER BRYSON:** Did you have a

19   plan or was it just day to day?

20        **INMATE STEELE:** It was day to day. It was -- we

21   would go down to the park and party and --

22        **PRESIDING COMMISSIONER BRYSON:** What park was

23   that?

24        **INMATE STEELE:** Huh?

25        **PRESIDING COMMISSIONER BRYSON:** What park was

34

1    TV's.    (inaudible) everything else I went through, I've

2    always worked since I've been down here supporting myself

3    (inaudible).

4        **PRESIDING COMMISSIONER BRYSON:**  Okay.  Turn your

5    attention right now to Commissioner Star who will talk

6    about your post-conviction factors.

7        **DEPUTY COMMISSIONER STAR:**  Mr. Steele, you had

8    last appeared before the Board in January of '06 and that

9    was actually your Subsequent number 11, I think, hearing

10   and was either denied for one year and then because of

11   the quarantine and the (inaudible) today for that.  At

12   the last Panel, they recommended that you remain

13   disciplinary free and continue to earn positive comments.

14   And I'll be looking at what's happened since that last

15   hearing.  I'm really focusing on that -- your activities

16   since that last hearing.  I'll also be -- I'll be -- read

17   and will be referring to (inaudible) one report which was

18   prepared on -- in January of '07 with updates since that

19   hearing did not occur.  And that counselor was Counselor

20   K. W. McLean, spelled M-C-L-E-A-N.  And then I'll be

21   reviewing your psych report as well.  Let's start with

22   your current classification floor is 19.  You're custody

23   level is medium A.  Since that last hearing in 2006, you

24   have had no disciplinaries.  In fact, your last CDC 115

25   was 1981.  You had one over -- that one overall since

1    your entire parole -- life term started.  That one CDC

2    115 occurred in 1981.  It was an assaultive one, however.

3    It was assault on an inmate.  Let's see.

4            **INMATE STEELE:**  (inaudible).

5            **DEPUTY COMMISSIONER STAR:**  It's the same year you

6    were received, right?

7            **INMATE STEELE:**  Yeah.

8            **DEPUTY COMMISSIONER STAR:**  The year you came in?

9    Okay.  And it was (inaudible) conduct?

10           **INMATE STEELE:**  Yes.

11           **DEPUTY COMMISSIONER STAR:**  Did he get a 115?

12           **INMATE STEELE:**  Yeah, we both did.

13           **DEPUTY COMMISSIONER STAR:**  Did he?  Okay.  128,

14   the counseling (inaudible).  There was a big -- a brief

15   -- a bit -- discrepancy in the report.  The correctional

16   counselor report said there had been three.  The

17   psychology report said two.  My review of the Central

18   File has only shown two.  Is that accurate or is there

19   three?

20           **INMATE STEELE:**  128s?

21           **DEPUTY COMMISSIONER STAR:**  Yeah.

22           **INMATE STEELE:**  I think it's like two or three.

23           **DEPUTY COMMISSIONER STAR:**  Okay.  (inaudible).

24   I'm going to again refer -- referring to what's in the

25   file --

36

1        **INMATE STEELE:** (inaudible) CDC.

2        **DEPUTY COMMISSIONER STAR:** -- there's only two

3    copies in here.  So for now, the Board's going to

4    recognize the two that are in the file which is a 1984,

5    having unissued property, and then 1985, unauthorized

6    area.   The counselor refers to a third one in 1982,

7    delaying a lockup, but I couldn't find anything.

8    (inaudible).

9        **INMATE STEELE:** (inaudible).

10       **DEPUTY COMMISSIONER STAR:** (inaudible) remove or

11   remember anything?

12       **INMATE STEELE:** I don't even remember that.

13       **DEPUTY COMMISSIONER STAR:** Okay.  Educationally,

14   Commissioner Bryson referred to you being a dropout and

15   you having attended some Special Education.  According to

16   the reports, I have that you graduated from the Tracy

17   Adult School in 1983.  Were you at (inaudible) at the

18   time?

19       **INMATE STEELE:** Yes.

20       **DEPUTY COMMISSIONER STAR:** Okay.  I also have the

21   psychologist saying you got a GED.  Did you also get a

22   GED?

23       **INMATE STEELE:** Yes.

24       **DEPUTY COMMISSIONER STAR:** Okay.  Do you remember

25   what year it was, sir?  I couldn't find that.

37

1           **INMATE STEELE:**  About 1983, I believe.

2           **DEPUTY COMMISSIONER STAR:**  Same year?

3           **INMATE STEELE:**  Yeah.

4           **DEPUTY COMMISSIONER STAR:**  Okay.  I'll check the

5      file.  I didn't see it, Commissioner, but I'll check

6      again.  Did you obtain any education after your GED?  Any

7      school?  College classes?  Anything?

8           **INMATE STEELE:**  No.  Just vocational.

9           **DEPUTY COMMISSIONER STAR:**  Okay.  Well let's look

10     and talk about that.  I found well documented

11     certifications for three vocational skills.  The first

12     one is sheet metal.

13          **INMATE STEELE:** Sheet metal.

14          **DEPUTY COMMISSIONER STAR:**  Completed in 1980 --

15     1990?

16          **INMATE STEELE:**  1986.

17          **DEPUTY COMMISSIONER STAR:**  It was '86?  1986.

18     April 1986.  Again, there is a chrono in your file that

19     was documenting that.  Then we have a 2003 certificate

20     for furniture, no cabinet program and furniture finisher.

21          **INMATE STEELE:**  Right.  Right.  Yeah I was --

22          **DEPUTY COMMISSIONER STAR:**  Right?

23          **INMATE STEELE:**  -- for about 10 years, I was

24     staining and finishing furniture.  I got about 9,000

25     hours.

1    term began and that included Rational Behavior, group
2    therapy, Communication Skills, training, Self-esteem in
3    the (inaudible) Group, Reality and Decision Making Group,
4    a relaxation group, Category T program, Alternatives to
5    Violence Workshop, another Alternatives to Violence
6    Workshop, Self-esteem Enhancement Group, Hiro's Men
7    Retreat, and the fourth -- four different chronos or
8    sessions of -- oh, four sessions of the Impact sixteen
9    week workshops.  And that was all before the last
10   hearing.  Any other self-help or programming activities
11   that I may have overlooked particularly since the last
12   hearing that want to tell the Board or any errors in
13   anything I've summarized so far?

14       **INMATE STEELE:**  No.  That's pretty much
15   everything.

16       **DEPUTY COMMISSIONER STAR:**  Okay.  Let's go ahead
17   and turn our attention then to the lastest psychiatric
18   evaluation.  That was completed on -- in July.

19   (inaudible).  March 22, 2007 by Richard Starrett.

20       **INMATE STEELE:**  Steven.  Oh, I'm sorry.  I'm
21   sorry.

22       **DEPUTY COMMISSIONER STAR:**  It's okay.

23       **INMATE STEELE:**  I was thinking of other.

24       **DEPUTY COMMISSIONER STAR:**  Richard Starrett is the
25   PhD doctor, S-T-A-R-R-E-T-T.  And he did a evaluation and

43

1    gave a diagnosis of -- put the diagnosis into the record
2    here -- axis I is a poly-substance abuse dependence and
3    can sustain full remission and treatment.  Axis II is an
4    antisocial personality disorder by history.  Axis III is
5    no diagnosis.  Axis IV is incarceration for the life
6    term.  And axis V is the functioning (inaudible) which is
7    (inaudible).  Now, the -- Dr. Starrett rates your
8    violence potential from a number of perspectives, and I'm
9    referring to Page 7 of his report.  First of all, it's
10   again historical perspective.  He says the inmate rates
11   in the moderate range in his propensity for violence and
12   he bases this on your past, your age at the time of the
13   crime, being involved in unstable relationships, not
14   establishing a career, being a substance abuser and
15   having an early maladjustment problem (inaudible) prior
16   failures while you were on police supervision.  And
17   that's his historical rate.  Then he rates it again based
18   on clinical and insight.  He rates you this time on low
19   -- in the low range stating that you have shown insight,
20   accepted responsibility and remorse, seen appropriate
21   regard to his controlling case.  He has a good response
22   to treatment.  He does not have a negative attitude and
23   has no mental health problems.  Then third, he rates you
24   on risk management.  Again, he rates you low.  He says
25   your parole plans, which we're going to be covering,

44

1   appears feasible.  All right.  And what -- he gives you a
2   overall assessment of risk at -- consider you as three
3   different perspectives -- I'm looking at Page 8 now --
4   and he says the overall rating for propensity for future
5   violence has moved now from the moderate range in the
6   past to a low range on clinical and risk factors.  It is
7   recommended that these ratings are contingent on the fact
8   that the inmate be continuously in alcohol and drug abuse
9   treatment, continuously be involved in self help in the
10  community and the inmate does not return to old lifestyle
11  issues.  It is recommended that the inmate develop and
12  structured plan on his release and activity schedule for
13  the community.  Then he was asked by the last Panel to
14  address several other issues, I'm just going to go over
15  those.  What is -- one of the issues was the significance
16  of alcohol as it relates to the -- alcohol and drugs as
17  it relates to the commitment offense and estimate of your
18  ability to refrain from that when you get out.  And the
19  doctor says your open really in acknowledging your use as
20  a major factor in your life and you committed yourself to
21  treatment and he is strongly recommending a release plan
22  and has a mentor and some type of AA/NA programming.  On
23  the next issue, which is whether there was any homophobia
24  issues, he goes over your background and your social
25  history and partially, I guess, explained this reaction

45

1    in the commitment offense and he's -- concludes that you

2    were embarrassed, ashamed and angry when the victim

3    grabbed you and over the years, you've had no homosexual

4    friends and no problems with them and it does not appear

5    to him that you (inaudible) homophobia had anything to do

6    with the crime.  I'm not sure what that statement means,

7    but maybe we need to address that.  The next issues is

8    cruelty to animals as apparently there was a --

9    information of you killed a cat in the neighborhood?

10        **INMATE STEELE:** I was -- shot a cat on (inaudible).

11        **DEPUTY COMMISSIONER STAR:** Okay.  Did law

12   enforcement contact you about that?

13        **INMATE STEELE:** No.  It was me and a friend.  We

14   were out shooting and we seen a cat and it was a old cat

15   and I had unfortunately shot and killed it.

16        **DEPUTY COMMISSIONER STAR:** Where'd you get the gun

17   for that?

18        **INMATE STEELE:** It was a family gun.  A .22,

19        **DEPUTY COMMISSIONER STAR:** Oh.  So the doctor

20   reviewed that and says there's no indication that the

21   inmate got any pleasure out of torturing animals, which

22   would be a red flag for a serial killer.  And then the

23   last issue is the ability to function in a less

24   structured community setting.  And he -- the doctor is

25   recommending a very structured release and re-entry plan

46

1    and an alternative absenter program in the case of family
2    support. So, I'm not sure -- this -- I want to go back
3    to this homophobia because I'm -- the doctor says that it
4    doesn't appear homophobia had anything to do with it
5    except you did have a reaction. How would you explain
6    that?

7         **INMATE STEELE:** I would explain -- when I was
8    growing up, the only thing I knew about homosexuals was
9    what my mom and my dad taught me. They were fags,
10   fairies, child molesters. I had never known a -- that I
11   had never met one. I shouldn't say met one.
12   (inaudible). When I was there, I -- you know --
13   everything that had been going on in my life -- it's
14   really not an excuse. I was embarrassed and I was angry
15   when he did it. And, I mean, I didn't set to kill the
16   man because he was a homosexual. It was unfortunately
17   (inaudible).

18        **DEPUTY COMMISSIONER STAR:** Did you initially tell
19   the police he grabbed you at the door?

20        **INMATE STEELE:** No, no. I -- not at the door.
21   When I was standing next to him.

22        **DEPUTY COMMISSIONER STAR:** In the bedroom?

23        **INMATE STEELE:** Yeah. When he was laying in his
24   bed -- just standing next to the bed is when he grabbed
25   me.

47

1          **DEPUTY COMMISSIONER STAR:**  Okay.  You reviewed

2     this report?  Did you agree with most of the doctor

3     (inaudible) said?

4          **INMATE STEELE:**  Yeah.  I think some of the stuff he

5     was talking about and he said he didn't believe that I

6     had a problem with homosexuals.  I mean, I've -- in

7     prison all the years, I've dealt with a lot of

8     homosexuals.  I -- one of the guys I worked with, his

9     name is Jeffrey, we worked together for two years side-

10    by-side.  To this day, he's one of the best co-workers

11    I've had and I've been -- I've had several gay friends

12    and I have a couple right now.  They're in my block.  I

13    have no problem with homosexuals.

14         **DEPUTY COMMISSIONER STAR:**  Fine.  I'll go ahead

15    and actually turn the attention back to Commissioner

16    Bryson.

17         **PRESIDING COMMISSIONER BRYSON:**  Thank you.

18         **DEPUTY COMMISSIONER STAR:**  Thank you.

19         **PRESIDING COMMISSIONER BRYSON:**  All right.  We do

20    have quite a few letters of support and some other

21    documents that you have, I guess, received.  One in

22    particular today.  So let me first start by asking you

23    basically what would be your plan for parole if given

24    (inaudible).

25         **INMATE STEELE:**  My plan for parole would be to go

48

1    live with my sister Janet (inaudible).

2         **PRESIDING COMMISSIONER BRYSON:**  Okay.  And that's

3    Janet Severs?

4         **INMATE STEELE:**  Severs.  Yes.

5         **PRESIDING COMMISSIONER BRYSON:**  Severs.  We have

6    her in Chico.  Is that where she lives?

7         **INMATE STEELE:** Yeah.  She's an older (inaudible).

8    When my mom -- that should be one of the letters in this

9    --

10        **PRESIDING COMMISSIONER BRYSON:**  Okay.

11        **INMATE STELLE:**  -- from the -- when we made the

12   file, we -- I just turned these in like about four months

13   ago, I think.  But she was living in Orland.  When my mom

14   came down first with emphysema and had lung cancer, she

15   wanted to move here and be close.

16        **PRESIDING COMMISSIONER BRYSON:**  I see.  Okay.  And

17   what is -- what does Janet do?

18        **INMATE STEELE:**  My sister's a manager at a Walmart

19   in Chico.

20        **PRESIDING COMMISSIONER BRYSON:**  I see.  Let's see.

21   You said (inaudible) because I'm not sure exactly where

22   that letter might reside.  Counsel, do you have hands on

23   that letter?  Can (inaudible).

24        **ATTORNEY GUNNING:**  (inaudible).

25        **PRESIDING COMMISSIONER BRYSON:**  We have about -- I

50

1          **INMATE STEELE:**  She moved back from Washington a
2     couple years ago.

3          **PRESIDING COMMISSIONER BRYSON:**  Oh, I see.  She
4     says, "I'm writing this letter of support of my brother,
5     and my husband and I offer our home to Claude Junior as
6     well as (inaudible) monetary support until he gets on his
7     feet living in (inaudible) county.  I have a stable home.
8     (inaudible) have his own personal space (inaudible)
9     surroundings.  (inaudible) and (inaudible) Counties both
10    have good AA and NA services as well as great jobs and
11    support opportunities for felons.  Claude Junior is
12    surrounded by family (inaudible) moral support and
13    anything else that's needed to help him (inaudible) back
14    to the society."  (inaudible).  And at one point, you had
15    plans to go to the Well Ministry of Rescue in Chico.  Is
16    that (inaudible) --

17         **INMATE STEELE:**  Yeah.  It was a -- it's a
18    Christian halfway house or for anybody that wants to go
19    over there that has a open mind.  It's still open.  He
20    said he would accept me upon release.  It's there if I
21    want it.  And there's another place in Red Bluff.  It's
22    new.  It's called Phoenix Rising my -- with Allison West.
23    She wrote it in a letter.  I just haven't received
24    anything back from her.

25         **PRESIDING COMMISSIONER BRYSON:**  And also, it says

51

1    friends outside (inaudible). I think I saw some

2    (inaudible) locations and times (inaudible).

3         **INMATE STEELE:** Yeah.

4         **PRESIDING COMMISSIONER BRYSON:** (inaudible).

5    Okay. All right. And I want to make sure some of these

6    -- first let me ask, do you have any specific job offers?

7         **INMATE STEELE:** The only somewhat job offer I got

8    is my sister's husband and friend, his best friend runs a

9    company called Valley Irrigation. He's the owner of

10   (inaudible) and my sister told him about me. I wrote him

11   a letter. He wrote a letter back basically stating that

12   he'd be willing to interview me when I'm released.

13        **PRESIDING COMMISSIONER BRYSON:** Okay. (inaudible)

14   a letter that's dated February 31st of 2006. It talks

15   about the (inaudible) received your letter (inaudible).

16   I'm aware of your time in prison for felony murder and

17   also your work history. Let me get his name on this. Is

18   that James Aulabaugh or --

19        **INMATE STEELE:** Aulabaugh, something like that. I

20   can't remember. My sister --

21        **PRESIDING COMMISSIONER BRYSON:** Aulabaugh?

22        **INMATE STEELE:** -- told me several times.

23        **PRESIDING COMMISSIONER BRYSON:** A-U-L-A-B-A-U-G-H.

24   The owner of Valley Irrigation (inaudible). He says I

25   have labor and maintenance positions available that I

52

1    would consider you for (inaudible).

2        **INMATE STEELE:** (inaudible).  Frank, my brother-

3    in-law.  He doesn't work there now.  He's working full

4    time for Caltrans, but also my brother's worked for him

5    in the past, too.

6        **PRESIDING COMMISSIONER BRYSON:**  I see.

7    Successfully?

8        **INMATE STEELE:**  Yes.

9        **PRESIDING COMMISSIONER BRYSON:**  Okay.

10       **INMATE STEELE:**  Yeah, he hurt his leg and now he

11   takes care of my grandmother as for my mom's wishes.

12       **PRESIDING COMMISSIONER BRYSON:**  All right.  We

13   have a letter that's current that just came on June 25th

14   of 2007 from Allison West, Executive Director of

15   California (inaudible) program.  Are you familiar with

16   that program?

17       **INMATE STEELE:**  Yeah.  It's what we were talking

18   about earlier.  The lady -- the -- every week I go and

19   see her.  She brings in the hot jobs from Red Bluff and

20   the Marin County area.

21       **PRESIDING COMMISSIONER BRYSON:**  Okay.  She talks

22   about meeting you.  She (inaudible) the mainland

23   population.  He's expressed a strong desire to have a

24   (inaudible) open (inaudible) be prepared.  I provided him

25   with resources from within Tehama County's both

53

1    (inaudible).  I send the job listings (inaudible) and

2    provide Mr. Steele with lists of potential employers.

3    (inaudible) cabinetry and wood working so I'm working on

4    identifying businesses in (inaudible) County.

5    (inaudible) that type of work and tend to find out about

6    the need for employees and their hiring practices.  He's

7    also expressed a willingness to do any type of work

8    that's available to him, so my searches have included all

9    possible options to demonstrate (inaudible) ongoing

10   opportunities for his employment.  Very good.  And, now

11   there's something in here about (inaudible) the backup

12   plan.  They reference your parents.  Is that -- was that

13   your -- this is Melvin and Shirley (inaudible).

14         **INMATE STEELE:** Yeah.  I got the letter before my

15   mom died.

16         **PRESIDING COMMISSIONER BRYSON:**  Okay.  Thank you

17   (inaudible).  So you have, by the way, a letter from the

18   -- dated October 21st of 2006.  And there are number of

19   chronos are -- were put (inaudible) I guess into this

20   part of the file.  You have a letter from your brother,

21   Richard, supporting your parole and then a letter from

22   your brother, I think -- I believe that's (inaudible) --

23         **INMATE STEELE:**  Well, I -- yeah.  I seen that.

24   That was just a (inaudible).

25         **PRESIDING COMMISSIONER BRYSON:**  Okay.  We have

54

```
1    some other (inaudible) industry, I'm sure you know.  We
2    also have (inaudible) statement.  I have a question.  You
3    received a public attorney, correct?
4         INMATE STEELE:  Yes.  Well this money, I cannot
5    touch.  It's there until I get out of prison.  That's
6    part of the deal between (inaudible) --
7         PRESIDING COMMISSIONER BRYSON:  (inaudible)
8         INMATE STEELE:  -- can't touch the pay.
9         PRESIDING COMMISSIONER BRYSON:  So that has been
10   set up --
11        INMATE STEELE:  Right.
12        PRESIDING COMMISSIONER BRYSON:  -- (inaudible).
13   That's (inaudible) letter (inaudible) brother and
14   friends.  You have a letter from Ava Kroesige, K-R-O-E-S-
15   I-G-E.
16        INMATE STEELE:  That's the halfway house that you
17   go -- well (inaudible).
18        PRESIDING COMMISSIONER BRYSON:  I see.  And there
19   indeed is the -- you have quite a bit of brochure
20   information from (inaudible).  You had a letter from S.
21   Allen (inaudible).  What was that again?  (inaudible).
22   So this is just more of the resources available to you --
23        INMATE STEELE:  Right.
24        PRESIDING COMMISSIONER BRYSON:  -- you had been
25   sent these (inaudible).  You also got a social services
```

55

1    (inaudible) from a Jay VanDyke, March 25 -- well this is

2    getting a little bit dated.  We're back in the 2004

3    timeframe now.  So, I believe that we've covered the

4    current material.

5          **INMATE STEELE:**  I had some letters I sent out to

6    my -- Mr. Billings.

7          **ATTORNEY GUNNING:** (inaudible).

8          **PRESIDING COMMISSIONER BRYSON:**  Yes.

9          **ATTORNEY GUNNING:** Okay.  He sent out numerous

10   letters seeking information from different agencies.

11   And, one's the EDD, one's from the (inaudible) Human

12   Resources Agency and job training center.  And he's also

13   got some -- a couple that's right -- also got these right

14   here which were returned.  These were all requests for an

15   appointment at the Corning Olive Oil Company in Corning

16   and the Corning Molding Company as well.  And these were

17   returned.  So these are examples of his attempts to find

18   employment.

19          **INMATE STEELE:** Yeah, that was the current address,

20   I got them out of the phone book.  Went back and double

21   checked when I got them back.  They came back with

22   nothing.  I sent some others out to -- I have the

23   addresses here, but I got no response back from

24   (inaudible).

25          **ATTORNEY GUNNING:** These are three other places he

56

1     sent letters out to.  McMahon's Furniture in Red Bluff,

2     Woodwork (inaudible) in Red Bluff, and the Cabinet

3     Specialties in Red Bluff as well.  This is a letter --

4     this is a response from the job training center dated the

5     21st of August 2006, which it looks like he's saying in

6     response to your attempt to find employment with this

7     outfit --

8          **INMATE STEELE:**  Basically -- if you don't mind --

9     all it says is we hope you get out.

10         **ATTORNEY GUNNING:**  I don't -- whether we just leave

11    these here for you if you want to go ahead and shoot them

12    off.

13         **PRESIDING COMMISSIONER BRYSON:**  That'll be good.

14         **ATTORNEY GUNNING:**  Okay.  And I've already

15    referenced these.  As indicated off the record earlier,

16    this is an example of what he received from the agency

17    which provides -- you know -- job opportunities in the

18    county on a weekly basis and I think we (inaudible).

19         **INMATE STEELE:** Yes.  It's not usually that big,

20    but --

21         **ATTORNEY GUNNING:**  Right.  This is the original

22    for his bank statement.  And he also has the AA

23    information and they've (inaudible) different between

24    locations where they're at -- where the corresponding

25    hours of each facility are.  So it -- in order for

57

1    California to include the Chico, Corning, Oakland --

2    (inaudible), should all be where he had.  And I provided

3    a copy of this to the (inaudible) as well.  It's just to

4    -- this is basically a synopsis of what he would be doing

5    once he is released.  It's kind of a 24/7 type scenario

6    of what he might -- what he'll be doing with his life

7    upon release.  And I don't know whether we mentioned this

8    (inaudible).  Does Mr. (inaudible) it basically indicated

9    that this --

10          **PRESIDING COMMISSIONER BRYSON:**  I don't think I

11   did.

12          **ATTORNEY GUNNING:**  -- as far as his experience, he

13   would be the equivalent of a journeyman, which I think is

14   important to note from the standpoint of marketability.

15          **INMATE STEELE:**  It's in the state of finishing

16   (inaudible).

17          **PRESIDING COMMISSIONER BRYSON:**  (inaudible) in

18   2006.

19          **PRESIDING COMMISSIONER BRYSON:**  Yeah.  Thanks.  I

20   -- he had two letters marked by these letters (inaudible)

21   remember to read those if I may at this time.  He had a

22   laudatory chrono from Correctional Officer Simone that

23   was dated April 10 who knows him from working in the --

24   from his working in North -- the officer's working in

25   North Block and he's had an opportunity to observe him

58

1    and says he's a gentleman, excellent character,

2    respectful, professional.  And there was also a laudatory

3    chrono dated November 1, '06 from Correctional Officer

4    Goad, G-O-A-D, who says he's been an officer for 24 years

5    and he's seen a lot of people come and go, but that Mr.

6    Steele's made a positive impression on him and that he's

7    currently employed in PIA and deserves another chance to

8    enter society.  And then the third one was the letter you

9    just read (inaudible), which was, I believe was -- yes --

10   the supervisor of wood products, A. Howell, H-O-W-E-L-L,

11   dated November 20th, '06, also an appreciation letter.

12   And I -- I didn't put those in (inaudible) in the

13   (inaudible).  Okay.  Is there anything else?

14            **ATTORNEY GUNNING:** No, ma'am.  That's it.

15            **PRESIDING COMMISSIONER BRYSON:** Thank you.  We

16   sent out 3042 notices.  Those notices were (inaudible) we

17   have an interest in your case.  We have a (inaudible)

18   District Attorney's Office Representative who will now

19   get an opportunity to make a statement regarding the

20   suitability prior to the conclusion of this hearing.  And

21   first let me ask Commissioner Star, do you have any

22   questions regarding any issues that we've discussed?

23            **DEPUTY COMMISSIONER STAR:** No.  No.

24            **PRESIDING COMMISSIONER BRYSON:** Sir, how do you

25   feel about -- well first let me ask you this, are you an

59

1   alcoholic?

2           **INMATE STEELE:**  Yes.

3           **PRESIDING COMMISSIONER BRYSON:**  And you've been in

4   AA fairly continuously.  Is that correct?

5           **INMATE STEELE:**  Yeah.  Since I believe about 1984.

6           **PRESIDING COMMISSIONER BRYSON:**  What's Step 4?

7           **INMATE STEELE:** Step 4 is really searching

8   (inaudible).

9           **PRESIDING COMMISSIONER BRYSON:**  Did you do that?

10          **INMATE STEELE:**  I have.  Yeah.  Yes.

11          **PRESIDING COMMISSIONER BRYSON:**  Do you work the

12  steps (inaudible) --

13          **INMATE STEELE:** I try to work them (inaudible).

14          **PRESIDING COMMISSIONER BRYSON:**  How do you make

15  amends?

16          **INMATE STEEL:**  By trying to better one's self with

17  what I did since I've been in prison, learning my job

18  skills, going through (inaudible), learning about myself

19  and the problems I have and the way I conduct myself in

20  (inaudible) become a better person.

21          **PRESIDING COMMISSIONER BRYSON:**  Did you ever know

22  anything about the victim and his family at all?

23          **INMATE STEELE:**  I know that he had a son and a

24  daughter living in, I think, South Dakota who were 21 and

25  24.  And that's all I knew of.

60

1         **PRESIDING COMMISSIONER BRYSON:**   Today, that's
2    their age?
3         **INMATE STEELE:**   No.
4         **PRESIDING COMMISSIONER BRYSON:**   (inaudible)
5         **INMATE STEELE:** Yes.
6         **PRESIDING COMMISSIONER BRYSON:**   Then?
7         **INMATE STEELE:** Yes.
8         **PRESIDING COMMISSIONER BRYSON:**   How old was
9    (inaudible)?
10        **INMATE STEELE:** I'm not positive, but I believe he
11   was in his early to low 50s.
12        **PRESIDING COMMISSIONER BRYSON:**   Were you afraid of
13   him?
14        **INMATE STEELE:**   I don't -- I wouldn't say I was
15   afraid of him.  I was kind of freaked out what happened,
16   what was going on, but I wouldn't say that I was afraid
17   of him (inaudible).
18        **PRESIDING COMMISSIONER BRYSON:**   So the question
19   would be (inaudible) in part of the (inaudible) that's --
20   that was the question.  Because it didn't appear that he
21   (inaudible) when he grabbed you.  That's why I'm asking.
22        **INMATE STEELE:**   Well, when he -- when he grabbed
23   me, that was (inaudible).  I went in there to confront
24   him.  I mean I was embarrassed what he wanted me to do.
25   I mean everything came out in my life what was going on,

61

1    the way I was right at that time.  In that six month

2    period, I ended up being kicked out and stuff and

3    (inaudible) was pretty much it and had thought that

4    everybody was against me.  And the way I handled problems

5    was get into fights with my only new friend and I want to

6    say I did not go in there with a hammer in my hand or

7    (inaudible) kill him.  I went in there to confront him

8    and unfortunately his hand there -- when he grabbed me,

9    it scared me.  And he (inaudible).

10   **PRESIDING COMMISSIONER BRYSON:**  All right.  I'd

11   like to ask the District Attorney if you have questions

12   (inaudible).

13   **DEPUTY DISTRICT ATTORNEY COHEN:**  I do.  I was

14   wondering if the inmate is clear in his mind whether or

15   not the alleged homosexual advance that the inmate said

16   took place in the bedroom did not take place outside in

17   the living room couch area of the home.

18   **INMATE STEELE:**  No he --

19   **PRESIDING COMMISSIONER BRYSON:**  (inaudible).

20   **INMATE STEELE:**   -- oh, you mean if he came out and

21   said some -- all he -- what happened was I turned around

22   and he's standing there in just his t-shirt and asked me

23   if I was ready.

24   **DEPUTY DISTRICT ATTORNEY COHEN:**  I'd like to ask

25   the inmate if this statement is accurate that's contained

62

1    in the original probation officer's report.  "Mr. Baldwin

2    then went in his bedroom and the defendant remained

3    sitting on the couch.  Mr. Baldwin then called to the

4    defendant and when he walked in the bedroom, Mr. Baldwin

5    was in bed and he then lifted the covers to expose

6    himself and he extended his arms toward the defendant.

7    Defendant then saw a hammer on the nightstand next to the

8    bed and he picked it up and hit Mr. Baldwin on the head."

9         **INMATE STEELE:**  The way that I remember --

10        **ATTORNEY GUNNING:**  Can I just ask where -- excuse

11   me -- can I ask what page you're on?  I mean I recall

12   reading it.  I just need to verify the page.

13        **DEPUTY DISTRICT ATTORNEY COHEN:**  Well, it's Page 5

14   of the probation report.

15        **ATTORNEY GUNNING:** Okay.

16        **DEPUTY DISTRICT ATTORNEY COHEN:**  In the legal

17   document section 6.

18        **ATTORNEY GUNNING:**  From the statement of facts?

19   Is that what you're looking at?  I believe that's what

20   you're looking at.

21        **DEPUTY DISTRICT ATTORNEY COHEN:**  It's under the

22   heading Present Offense.

23        **ATTORNEY GUNNING:**  Okay.  I understand.  Just want

24   to show my client.  (inaudible).

25        **INMATE STEELE:**  What happened was -- the way I've

63

1    always remembered it and the way I always remember

2    telling it is that he came out and I heard him. I turned

3    around and he's standing there with nothing but his t-

4    shirt and he asked me if I was ready. And I said, "Hey,

5    I ain't like that." He walked -- he turned around, went

6    back in his room. I put on my shoes and I can't remember

7    if I had my things off, my shirt off, what, but I put my

8    clothes back on. I was at the door leaving when he said,

9    "Hey, come in here." And that's when I had -- I walked

10   into the room. I walked around the (inaudible) corner of

11   his bed. He pulled back the covers, reached up, grabbed

12   me in the crotch area and told me he wanted to suck my

13   dick. And I said -- and that's when I picked up the

14   hammer and I hit him. That's the way I've always

15   remembered that night.

16        **DEPUTY DISTRICT ATTORNEY COHEN:** I want to ask the

17   inmate whether or not that he recalls the blows that he

18   struck -- the fatal blows to Mr. Baldwin's head resulted

19   in a laceration of his brain in several areas.

20        **INMATE STEELE:** I just remember hitting him and

21   there being a lot of blood. I don't remember there being

22   no open wounds or anything. I mean, he was bleeding, but

23   I don't remember nothing like that, other than what I've

24   read.

25        **DEPUTY DISTRICT ATTORNEY COHEN:** I want to ask the

64

1    inmate if he recalls whether or not he hit the victim 11

2    times with the use of a claw hammer as indicated in the

3    autopsy report.

4         **INMATE STEELE:**  I don't remember how many times I

5    hit him specifically.  I just remember hitting him a lot.

6         **DEPUTY DISTRICT ATTORNEY COHEN:**  I want to ask the

7    inmate whether or not he recalls whether or not he stated

8    before that he's used cocaine.

9         **INMATE STEELE:**  Yes.

10        **DEPUTY DISTRICT ATTORNEY COHEN:**  I want to ask

11   the inmate whether or not Janet, which is the person he

12   would like to parole with, has previously been a

13   substance abuser.

14        **INMATE STEELE:**  She was until about 20 years ago

15   when she had her second daughter.

16        **DEPUTY DISTRICT ATTORNEY COHEN:**  I want to ask the

17   inmate whether or not the program that he identified as

18   The Well that he said he would seek assistance from in

19   2005, if that would be the type of program that he would

20   succeed in that it's a religious based program and I

21   don't see much indication of defendant's religious

22   convictions in any of the packets that I've observed.

23        **INMATE STEELE:**  Well, I do have some beliefs and

24   the program, it is religious based, but they want to you

25   come here -- in there with an open mind.  And after 27

65

1    years, I think I've pretty much succeeded in that.

2        **DEPUTY DISTRICT ATTORNEY COHEN:**  I don't have any

3    other further questions for the inmate.

4        **PRESIDING COMMISSIONER BRYSON:**  All right.  Thank

5    you.  Counsel, do you have questions?

6        **ATTORNEY GUNNING:**  Just a couple.  Mr. Steele,

7    when you killed Mr. Baldwin here with a hammer, this

8    happen fairly quickly?

9        **INMATE STEELE:**  Yes, sir.

10       **ATTORNEY GUNNING:**  You know, when everything's

11   fast?  How did it happen?

12       **INMATE STEELE:**  You know -- I remember most of it,

13   hitting him.  I don't -- I can't remember if it was real

14   fast.  I hope it was.

15       **ATTORNEY GUNNING:**  Do you deny hitting him

16   multiple times now?

17       **INMATE STEELE:**  No.  No, I know I hit him multiple

18   times,

19       **ATTORNEY GUNNING:**  With regard to your

20   participation in Alternative to Violence programs and

21   self help programs, what is it about these programs that

22   have assisted you or helped you with regards to your own

23   situations similar to what (inaudible) at the time you

24   killed Mr. Baldwin?

25       **INMATE STEELE:**  Well, what it is is I was out

66

1    there -- will you repeat that?

2        **ATTORNEY GUNNING:**  You participated in an

3    Alternatives to Violence programs.  Okay.  And I guess my

4    question to you is as a result of you being involved in

5    these types of programs (inaudible) let you know that,

6    what would you do differently (inaudible)?

7        **INMATE STEELE:**  What I learned, I never would have

8    started hanging out with my brother and drinking.  That

9    would be the first thing.

10       **ATTORNEY GUNNING:**  And why's that?

11       **INMATE STEELE:**  Because that's when everything

12   went wrong.  It brought out the worst in me.  I was -- it

13   was -- as a kid, I was going to the Special Ed programs

14   (inaudible) you know -- I didn't know how to function

15   well with regular kids.  I wasn't invited to a lot of

16   things because I was in these programs and when I drank

17   alcohol, it really made me feel like I was somebody.  And

18   it made me very aggressive.

19       **ATTORNEY GUNNING:**  So you had some self-esteem

20   issues when you were young?

21       **INMATE STEELE:**  I had some serious self-esteem

22   problems.  But when I drank -- you know -- I was great.

23       **ATTORNEY GUNNING:**  Let's talk about that then

24   quickly, just by way of follow up.  You're brother was 10

25   years older than you?

67

1        **INMATE STEELE:**  Yes.

2        **ATTORNEY GUNNING:**  So, you're hanging out with

3    your brother with kid -- with people his own age?

4        **INMATE STEELE:**  Yes.

5        **ATTORNEY GUNNING:** And you're like 15, 14?

6        **INMATE STEELE:**  13, 14 years old.  And they're 23,

7    24.

8        **ATTORNEY GUNNING:**  And then you're drinking with

9    these adults at that particular time?

10       **INMATE STEELE:**  Yes.

11       **ATTORNEY GUNNING:**  So you're getting involved in

12   fights (inaudible)?

13       **INMATE STEELE:**  I was in quite a few fights and

14   won most of them, I thought.  But that's when I said --

15       **ATTORNEY GUNNING:**  When you were a young teenager.

16       **INMATE STEELE:** -- yeah.  Like I said is my brother

17   at that time was a big guy and he was -- I mean I didn't

18   realize that he was a bully and the only reason I was

19   being tolerated because he was around and once he left,

20   those people that -- I thought I was cool and trying to

21   be like my brother -- people just slapped around a few

22   times because he wasn't there to protect me.

23       **ATTORNEY GUNNING:** So, it sounds like you're

24   communicating to the Panel that as a result of what you

25   learned in Alternatives to Violence is also -- is kind of

68

1    connected in similar ways to alcohol anyomous, AA.  Would
2    you agree with that?

3          **INMATE STEELE:**  Yes.

4          **ATTORNEY GUNNING:**  Which you've been involved in
5    that for 20 some odd years now, I guess 22 years?  Is
6    that about right?

7          **INMATE STEELE:**  It was '84.  About 24.

8          **ATTORNEY GUNNING:**  Almost said 22.

9          **INMATE STEELE:**  24 years.

10          **ATTORNEY GUNNING:**  A long time.  When you get to
11    the streets, you going to continue with that?

12          **INMATE STEELE:**  Of course.  I've (inaudible).

13          **ATTORNEY GUNNING:**  So, if you find yourself in a
14    similar situation where you've got stressors happening,
15    you're going to come across a lot of stressors when you
16    get released, I can tell you right now, and you find
17    yourself in a situation where some guy walks up and grabs
18    your crotch, what are you going to do?

19          **INMATE STEELE:**  I'm going to walk away and ask for
20    -- continues to ask for a -- somebody who come in the
21    situation like that.

22          **ATTORNEY GUNNING:**  To resolve the situation?

23          **INMATE STEELE:**  Resolve the situation.  I
24    (inaudible) you know -- I'm not going to be drinking.  I
25    know how to walk away from a situation.

69

1        **ATTORNEY GUNNING:** And let's talk about the

2    drinking issue.  Who -- what are you going to place

3    (inaudible) upon yourself in a situation with a lot of

4    stress.  What are you going to do about that?  Who are

5    you going to call?  What are you going to do about it to

6    resolve that?

7        **INMATE STEELE:**  Well, once I get out -- you know

8    -- one of the first things I'll do is I'll find the AA

9    meeting (inaudible) and I'll get a sponsor.  There's --

10   it's like in the book and everybody I've talked to, the

11   outside sponsors that have been -- that come in from the

12   streets and stuff always say go to 90 meetings in 90 days

13   and there's always somebody there from the program to

14   help you.  And there's some people that's told me I can

15   write them or even call them once I get out -- you know

16   -- while we're in here (inaudible) like that.

17       **ATTORNEY GUNNING:**  That's all I have.

18       **PRESIDING COMMISSIONER BRYSON:**  I'd like to invite

19   the District Attorney to make a closing statement.

20       **DEPUTY DISTRICT ATTORNEY COHEN:**  Thank you.  I've

21   been here a couple times before on behalf of Mr. Steele

22   and Mr. Baldwin and I have to again commend Mr. Steele in

23   his practice in prison life.  The concern I have -- we

24   have in Tehama County is we are a very small rural county

25   with not a lot of employment opportunities.  That would

70

 1    hold true for Glenn County, which is the county that Mr.
 2    Steele now is saying he would like to parole to, which is
 3    Orland.  Red Bluff is in my county, the county of Tehama.
 4    So the concern the people have is that although Mr.
 5    Steele seems to track very, very well in this
 6    institution, we are concerned with what the psychologist
 7    eluded to, the fact that he needs complete structure in
 8    his life.  And I applaud him for what he's done recently
 9    as far as trying to find people that would potentially
10    employ him.  It's good at this point in time during this
11    hearing that I think he does understand that he needs to
12    secure his attendance at AA.  I haven't heard much
13    mention of NA, but would trust that if he was paroled at
14    some date in the future that that would be part of his
15    life regimen as well.  It's good that he's participated
16    in domestic violence -- or excuse me, violence counseling
17    because I believe that was something that was lacking as
18    well.  I believe that Mr. Steele can parole sometime in
19    the future and my suggestion would be to see Mr. Steele
20    continue with this course seeking employment, seeking to
21    better himself and seeking to utilize others to help.
22    With that, I submit.
23              **PRESIDING COMMISSIONER BRYSON:**  Thank you.
24              **DEPUTY DISTRICT ATTORNEY COHEN:**  Thank you.
25              **PRESIDING COMMISSIONER BRYSON:**  And counsel,

71

1    (inaudible) closing statement.

2        **ATTORNEY GUNNING:**  Thanks.  At the onset of this

3    hearing, Commissioner, you asked him to be honest.  And I

4    think he's been very straightforward with the two of you

5    today and your questioning.  Regarding the commitment

6    offense, as you are well aware, that's something that I

7    don't normally have people do, but in this particular

8    case, he wanted to go ahead and talk about the offense

9    and that's his call.  He did that.  He was very

10   straightforward about what happened, why he did it.  And

11   I'll leave it to him as to what he has to say about how

12   he feels about what he did.  But as far as the facts, I

13   think he's deferred to the system over time about what

14   happened.  And keeping in mind that even though we don't

15   have an extra toxicology report or anything like that

16   about where he was at alcohol-wise, I suspect he was

17   under the influence at that particular time whether he

18   passed the field sobriety test or not.  There's been

19   alcoholic -- alcoholics pass those tests very easily

20   because by virtue of being an alcoholic.  The commitment

21   offense was a horrendous offense.  He was convicted by

22   plea of second degree murder.  Mr. Baldwin didn't deserve

23   it -- to lose his life because he was homosexual.  But as

24   you indicated, Mr. Steele was 18 at that particular time.

25   I think he was way out of his element with regard to the

72

1    situation and there was before.  You combine alcohol and
2    a variety of machismo type elements, he indicated to you
3    he wanted to confront the man.  And that's how he --
4    that's how we did business back in those days.  And
5    think, had it not been for the fact that he was grabbed,
6    he probably would have walked away.  In no way, by the
7    way, am I saying that this is Mr. Baldwin's fault.  I'm
8    saying that was the catalyst.  That was the thing that
9    changed it from being a confrontation to a killing.
10   Because he basically snapped at that particular time and
11   he doesn't recall how many times he hit him.  That would
12   indicate a lot of emotion at that particular time.  And
13   he did a lot of damage to Mr. Baldwin's head given what I
14   saw in the probation report and some of the photographs
15   and stuff that I took a look at here.  That would show an
16   awful lot of emotion on his part.  I don't think this was
17   calculated on his part.  I don't think it goes beyond the
18   minimum necessary for second degree murder given many
19   other cases that the courts have looked at and concluded
20   the same thing based on what I have read.  He has been
21   incarcerated since 1981 for this offense.  He's now at 26
22   years coming up in August, that's next month.  And I
23   think if you look at the matrix, he is beyond the matrix
24   if you combine his good time, four months per year for
25   all but one year.  He's only had one 115 since his

1    incarceration.  So in his entire incarceration, there's
2    only one year where you would have to be able to take
3    four months away from him.  So, I do think, at least from
4    the standpoint of the matrix, I think he's satisfied that
5    criteria.  And again, as noted, he was a teenager at the
6    time he committed this offense.  That's one of the other
7    elements you can look at from the standpoint of
8    suitability as well.  That was one of the things the bar
9    case looked at.  The KUR -- they looked at how a teenager
10   views things and how they think at 18 as compared to
11   somebody who might be in their 20s and 30s and they don't
12   think like many mature adults.  And that was -- I think
13   that's an important case to consider when you're looking
14   at conduct for teenagers.  I'm not saying it's a
15   mitigating factor in any way.  I'm just saying that's how
16   teenagers think.  And I think it's something to consider
17   when you're trying to figure out whether or not, as he is
18   today, whether he's going to be thinking the same way now
19   as he would've when he was 18 years old.  Pre-conviction
20   factors -- there were a lot of variables that this panel
21   should have concern about.  We acknowledge that.  He had
22   a lot of anger when he was younger and he dealt with it
23   as a result of his drinking and self esteem issues.  I
24   would ask you to consider whether or not he's addressed
25   those issues.  If he has, then I don't think those issues

74

1    are a factor anymore.  If he hasn't, then this Panel
2    should deny him.  But I believe based on his record that
3    he has addressed those issues.  He has participated in a
4    lot of self help programs over the years, his anger
5    management, AA participation.  He's addressed the --
6    those factors that caused a lot of problems when he was
7    younger.  The self-esteem issues.  Things of that nature
8    I think have been addressed.  He's now 45 years old.
9    He's considerably older than he was when he came inside.
10   From a standpoint of his citivism, he's beyond that 39
11   year old benchmarker that people look at from the
12   standpoint of going back and committing crimes.  He does
13   have a favorable psychological evaluation from Dr.
14   Starrett who has a low assessment.  He does have
15   marketable skills.  He does have vocational skills that
16   would be the equivalent of a journeyman in the
17   woodworking arena.  I think he'd make a good living on
18   the outside.  He does have a job offer.  He does have a
19   place to reside.  If these are issues of concern for this
20   Panel, they can take care of that through parole.
21   (inaudible) a problem, then of course, you can take his
22   date away if you decide you're going to give him one.
23   But at this point, anyway, he does have a place to reside
24   and he does have a place to work and he does have
25   marketable skills.  He's made a considerate effort to

```
 1    seek employment.  So he's proactive in that environment.
 2    I think that's important, because when he gets out, he
 3    will remain proactive in seeking employment.  I doubt
 4    he's going to stay with where he's at with regard to Jeff
 5    for the employment.  It's a good place for him to start
 6    to get his feet on the ground and in time, he'll be able
 7    to move out and venture into those areas which I think he
 8    has some real expertise.  Disciplinaries -- he has had
 9    one back in 1981.  It was an assault on an inmate.  I
10    noted two 128s, maybe three, but two (inaudible).  So,
11    it's been a long time without 128s as well.  That sends a
12    fairly commendable record given the amount of time he's
13    been incarcerated.  He does have his education.  So, I
14    think he's got everything in place today that would lead
15    a reasonable person to conclude he's no longer an
16    unreasonable risk to society.  That's the saving point.
17    Is he presently an unreasonable risk and I would say that
18    he's not.  So that being said, we are going to request
19    (inaudible).
20          PRESIDING COMMISSIONER BRYSON:  Thank you.  Sir,
21    (inaudible).
22          INMATE STEELE:  Yes.  I'm suitable for parole
23    (inaudible).  There's no excuse.  I took his life away.
24    I'm terribly sorry for it.  And to his family, especially
25    his son and his daughter and his other family members,
```

76

1   his friends, and the community and especially the people

2   that had to find him there in his home.  And to my own

3   family, the pain and shame I brought to them because of

4   what I did, the way I treated them over the years.  I've

5   learned a great deal in prison.  I've learned some good

6   job skills.  I understand where my anger came from.  I

7   know that alcohol played a big part in what I did, but --

8   you know -- the responsibility lies with me.  I have

9   great support with my family.  I've learned some good job

10  skills and if you give me the opportunity, I'll be

11  successful on parole.  Thanks very much.

12          **PRESIDING COMMISSIONER BRYSON:**  Thank you sir.

13  And now recess (inaudible).  The time is 1722.

14                  **R E C E S S**

15                    --o0o--

16

17

18

19

20

21

22

23

24

25

77

1                  CALIFORNIA BOARD OF PAROLE HEARINGS

2                       D E C I S I O N

3      **DEPUTY COMMISSIONER STAR:**  Okay.  We're back on

4    record.

5      **PRESIDING COMMISSIONER BRYSON:**  The time is 1814.

6    We've reconvened in the matter of Claude Steele.  All

7    parties have returned to the room.  All right, sir, this

8    Panel reviewed all information received from public and

9    relied on the following circumstances in concluding that

10   you're not yet suitable for parole and would pose an

11   unreasonable risk of danger to society or a threat to

12   public safety if released from prison.  This will be a

13   one year denial and I hope you're listening.  This

14   offense was carried out in an especially cruel and

15   callous manner in that on January 1st of 1981 during a

16   vehicle stop and site by Tehama County Sheriff's

17   department for failing to stop at a stop sign, you

18   started crying and confessed to killing Clarence Baldwin.

19   You said Baldwin made unwanted repeated homosexual

20   advances towards you so you struck the victim on the head

21   with a hammer and -- killing him.  This crime was

22   committed at the victim's residence while the inmate

23   (inaudible) were under the influence and victim had

24   permitted you to stay over night with him.  You told the

25   **CLAUDE STEELE  C-34972  DECISION  PAGE 1  07/23/07**

78

1    probation officers they next thing you recall was driving
2    Mr. Baldwin's vehicle on Antelope Boulevard.   There was a
3    wallet containing two -- 400 dollars, a weapon, the
4    hammer, was on the front seat.   This offense was carried
5    out dispassionately.   Officers found Baldwin lying in bed
6    with massive head injuries still warm to the touch.   Upon
7    arrival of the coroner which pronounced the victim dead
8    at the scene.   This offense was carried out in a matter
9    demonstrating exceptionally callous disregard for human
10   suffering.   It's very difficult to kill someone with a
11   hammer and you did so -- repeated blows to the head over
12   and over and over again.   To your great credit, you have
13   begun the long journey of introspection and insight into
14   the crime and you are now, you say, have memory of those
15   blows and of hitting this gentleman.   There's still a
16   significant period of time that is unaccounted for in
17   your memory.   You did, sir, take advantage of a position
18   of trust and confidence that in that you and the victim
19   had been on friendly terms celebrating New Year's Eve and
20   the victim was vulnerable, unarmed, and in bed at the
21   time of the attack.   This crime was very trivial in
22   relation to the offense and you had a clear opportunity
23   to cease.   You could have walked out that door, as you've
24   been very frank in discussing here with the Panel.   The
25   **CLAUDE STEELE  C-34972  DECISION  PAGE 2  07/23/07**

79

1   Panel appreciates your discussing this.  We think it's a

2   healthy thing that you're able to discuss it and it's

3   important because obviously this crime is very difficult

4   to understand.  This Panel feels that this crime was more

5   than the minimum necessary for the conviction of a murder

6   second degree.  And harkened to your history, you do have

7   violence in your history as a juvenile.  You have

8   unstable social history and chose an escalating pattern

9   of criminal conduct.  You failed society's previous

10  attempts to correct your criminality with commitments to

11  the Youth Authority and juvenile parole.  And so you did

12  have -- and you also had time at a ranch, a boy's ranch,

13  and yet you still continued to choose to drink, but to

14  your great credit again, you've become frank with the

15  Panels and you are admitting your alcoholism and you seem

16  to be working very hard on a programming standpoint to

17  deal with that.  Your prison work has been very stable

18  prison work that you continue.  You have done exceptional

19  vocational certification.  You've basically gotten three

20  vocations including sheet metal, milling cabinets,

21  furniture finisher, and fork lift operation.  You have

22  the equivalent of journeyman in staining and finishing.

23  So you do appear to have marketable skills that you've

24  developed.  Several laudatory chronos were read into the

25  **CLAUDE STEELE  C-34972  DECISION  PAGE 3  07/23/07**

1 file. You also have been a member of -- actually are a
2 member of the After Prison Advisory Group. That goes to
3 your credit as well. As to self-help and therapy, you
4 did show that you are aware of the steps and are working
5 -- you appear to be working them and you appear to have
6 internalized them. I can tell you there are a lot --
7 many prisoners who appear before us who have not, even
8 though they did spend many years of AA/NA, but they still
9 clearly have not internalized the steps. You appear to
10 have done so, which is excellent. And most recently,
11 you've been a partner to Developing a Positive Attitude
12 program and you're to be commended for that. Also, you
13 did achieve your -- 1983, your Adult School of Tracy and
14 also your GED. As to your misconduct in prison, you've
15 had one 115 and that was in 1981, your assault on an
16 inmate. And so basically you have a good record in your
17 prison career as far as having a positive attitude. As
18 for the psychological report dated March 22nd of 2007 by
19 Dr. Richard Starrett, we were somewhat troubled by his
20 report and as a result, we're going to be requesting a
21 psychological evaluation even though this is a July 2007
22 report. Still, we're going to request a new one. And
23 we've asked some specific questions in that report. But,
24 we have reached -- we have seen a number of conflicting
25 **CLAUDE STEELE C-34972 DECISION PAGE 4 07/23/07**

81

1    statements about the reason for your committing this
2    crime and at some point, some of those should be
3    resolved.  On Page 4 of the clinician's report, he asks -
4    - he states that when the in -- when asking the inmate
5    why he committed the crime, the inmate states for the
6    last several months prior to the time, he was kicked out
7    of his parent's home.  He was not feeling loved by the
8    family.  It said all of his frustrations came out on the
9    victim and you said alcohol did play a role, which was
10   the major factor that we cited here today.  You
11   historically remained in the moderate range in your
12   propensity for future violence.  However, the clinician
13   evaluated you as rating low range on the clinical insight
14   factor for the propensity for future violence.  He states
15   the inmate's insight, acceptance of responsibility and
16   remorse seem appropriate in regard to his (inaudible)
17   case.  We're not sure what to make of "seem appropriate",
18   but we do have some remarks on your insight.  As for risk
19   management, the clinician does rate you in the low range.
20   He also feels that parole plans do seem feasible.  He
21   mentions that your level of psychopathy is low and that
22   your -- inmate's overall rating for propensity for future
23   violence has moved now from the moderate range in the
24   past to the low range on clinical and risk management
25   **CLAUDE STEELE  C-34972  DECISION   PAGE 5  07/23/07**

82

 1    factors.  He does mention, which we would also like to
 2    point to, that you have been clean and sober for 26
 3    years.  He also points to the fact that you were
 4    attempting to leave, but you were called into the bedroom
 5    by the victim.  I'm going to address that again in a
 6    moment.  The inmate states he was drunk and in the past,
 7    when he was drunk, he often became - he became
 8    confrontational.  The inmate was embarrassed, ashamed and
 9    angry when the victim grabbed him sexually and he
10    reacted.  And then on Page 9, the clinician said it does
11    not appear that homophobia had anything to do with the
12    inmate's crime.  He also points to the need for a
13    structured environment and re-entry plan, which you do --
14    you have addressed.  As to your parole plans, you do
15    appear to have viable parole plans in that you plan to
16    live with your sister, Janet Severs, in Orland and you do
17    have a backup plan, The Well in (inaudible) in Chico, and
18    you do appear to have acceptable employment plans, but
19    the law does not require that you have a current job
20    offer.  But you do have, through your sister's husband,
21    an offer for an interview, which sounds -- and so it's
22    very positive with Valley Irrigation.  And you have sent
23    letters of outreach to job training centers and social
24    services and continuing with that, which is very good.
25    **CLAUDE STEELE  C-34972  DECISION    PAGE 6  07/23/07**

83

1   And you also have looked at programs available for AA and
2   NA on the outside.  So that's good also.  Responses
3   indicate opposition defining your parole suitability,
4   specifically (inaudible).  In -- going back -- your
5   insight.  This we felt was important.  The question is,
6   do you have full insight that you can achieve and it's
7   necessary for you to have before you go out into the
8   commitment offense such that you understand (inaudible)
9   of this commitment offense.  Despite knowing this victim
10  was a homosexual, you went into an intimate location such
11  as the bedroom and you walked up to his bed.  You were in
12  his arm's reach and you engaged in some type of
13  discourse.  Then, when he grabbed you, this hammer was
14  suddenly -- it was there and you repeatedly hammered him
15  and then after that, you rummaged his residence and you
16  robbed him.  You took his car keys, you robbed him of his
17  wallet with money and took his car.  You took his stereo
18  equipment.  That's not somebody that is just angery and
19  explodes and then flees.  You took the time to go ahead
20  and rob this guy.  And you say you don't have the memory
21  of that.  The next thing you remember was the police had
22  you walking a line to inebriation.  Sir, we feel that
23  it's really important that you deal with those -- that
24  motivation and what was going on with you.  Because this
25  **CLAUDE STEELE  C-34972  DECISION   PAGE 7  07/23/07**

84

1   is a particularly vicious crime.  You not only beat a man
2   to death when he's down on his back -- yes, he grabbed
3   you, but he isn't standing over you.  He wasn't
4   (inaudible) with you and you had an opportunity to get
5   away from him.  You viciously and deliberately beat him
6   then robbed him.  So that's what we've struggled with.
7   And we have difficulty with that -- that you truly
8   understand and can delve into the extent that you bring
9   everything out on the table.  It was clear, to me at
10  least, that you had zero depth of relationship with your
11  father.  Perhaps there was a background there that made
12  it very hard for you to deal with interpersonal relations
13  with him.  I don't know, but I think it's important that
14  you look into this because we had a statement in the 2004
15  psychological evaluation that's -- where you said that
16  you were terrified of homosexuals.  That was in the 2004
17  psychological report.  And yet, in 2007, we have the
18  clinician saying no evidence of homophobia.  So, the
19  question is why -- why at some point and what was the
20  relationship to the commitment offense did this
21  homophobia really truly exist or not and then how did the
22  robbery play into all of this.  We think that's
23  important.  And we know it's easy for us to check off a
24  box on a piece of paper.  You have to live another year
25  **CLAUDE STEELE   C-34972   DECISION     PAGE 8   07/23/07**

1    here, but we think that this is really critical.  This is

2    the nexus of are you in fact going to be able to control

3    yourself on the outside when people are aggressive toward

4    you.  Denying you parole for a year.  We're placing you

5    on the July 2008 calendar for your next Subsequent

6    Hearing and recommending no more 115s or 128s, you could

7    get self-help, you continue to do the introspection you

8    need to do, earning positive chronos, continue your

9    positive programming and we are ordering a new

10   psychological evaluation for BPT Form 1000A.  And I'd

11   like to ask Commissioner Star if there's anything

12   (inaudible).

13           **DEPUTY COMMISSIONER STAR:**  No.  Well, yes.  I can

14   reinforce the commending you sir that you (inaudible)

15   outstanding self-help efforts, your continuing search for

16   job is really above and beyond what I've normally seen in

17   these hearings and as frustrating as I think it is, I

18   think you've really done an extraordinary job in your job

19   search and I just wanted to recognize that too.  Thank

20   you.

21   ///

22   ///

23   ///

24

25   **CLAUDE STEELE  C-34972  DECISION   PAGE 9  07/23/07**

1           PRESIDING COMMISSIONER BRYSON:  And good luck sir.

2                  A D J O U R N M E N T

3                       --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    PAROLE DENIED ONE YEAR
                                    NOV 2 0 2007
22    THIS DECISION WILL BE FINAL ON:_____ ____ ____

23    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

24    DATE, THE DECISION IS MODIFIED.

25    CLAUDE STEELE  C-34972  DECISION  PAGE 10   07/23/07

87

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, JEANNIE MOORS, a duly designated transcriber, FOOTHILL TRANSCRIPTION COMPANY, INC., do hereby declare and certify under penalty of perjury that I have transcribed the audio recording which covers a total of pages numbered 1 - 88, and which recording was duly recorded at CALIFORNIA STATE PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of CLAUDE STEEL, CDC No. C-34972, on JULY 23, 2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned audio recording to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated AUGUST 26, 2007 at Sacramento County, California.

JEANNIE MOORS Transcriber
**Foothill Transcription Company, Inc.**

EXHIBIT "B"

Court of Appeal, Third Appellate District - No. C057809
**S160937**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re CLAUDE STEELE on Habeas Corpus

The petition for review is denied.

George, C.J., was absent and did not participate.

SUPREME COURT
FILED

APR 1 6 2008

Frederick K. Ohlrich Clerk

_____
Deputy

WERDEGAR
_____
Acting Chief Justice

IN THE
# Court of Appeal of the State of California
IN AND FOR THE
## THIRD APPELLATE DISTRICT

# FILED

FEB - 7 2008

In re CLAUDE STEELE on Habeas Corpus.

COURT OF APPEAL - THIRD DISTRICT
DEENA C. FAWCETT

BY_____ Deputy

C057809
County
No.

BY THE COURT:

The petition for writ of habeas corpus is denied.

Dated: February 07, 2008

NICHOLSON, Acting P.J.

----------------------------------

cc: See Mailing List

DEC 18 2007

COPIES SENT TO COUNSEL ON

F I L E D
SUPERIOR COURT OF CALIFORNIA

DEC 18 2007

COUNTY OF TEHAMA, CRIMINAL DIVISION
IRENE RODRIGUEZ, CLERK OF THE COURT
BY

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF TEHAMA

CLAUDE STEELE,

                            Petitioner,            No. CR03534

                vs.                   **RULING ON PETITION FOR**
                                        **WRIT OF HABEAS CORPUS**

**THE PEOPLE OF THE STATE**
**OF CALIFORNIA,**

                          **Respondent.** /

        Petitioner again seeks relief from this Court due to a decision of the California Board of Parole Hearings, in which Petitioner was denied a parole date. In a decision filed by this Court in April 2006, ruling on a prior petition, this Court had expressed the opinion that the findings of the Board suffered from ambiguity. Such is not the case this time.

        The Board of Parole Hearing's findings, commencing at page 77 of the transcript, are clear. The findings are based on at least some evidence, therefore, the findings meet the criteria of **In re Rosenkrantz (2002) 29 Cal.4th 616**. The Board of Parole Hearing's findings regarding the offense are sufficient to demonstrate that the circumstances of the offense, and Petitioner's conduct immediately following the offense, would be sufficient under the "some evidence" test to justify denial of parole. **In re Dannenberg (2005) 34 Cal.4th 1061,1094**. Additionally, although the record is incomplete, in that the Court did not receive a copy of a psychological expert's report, it appears that the decision was also, at least in part, based upon Petitioner's current psychological condition and either his unwillingness, or incapability of remembering important details of the offense.

        The power to set a parole date is vested in the Board of Parole Hearings. [**Penal**

1

1   Code §3041.] The role of this Court is not to evaluate the evidence, or to reweigh the evidence, or

2   to in any way insert its judgment in that decision. This Court's role is merely to find whether or

3   not there is some evidence to support the Board's decision. [In re Rosenkrantz , supra, 652; In

4   re Powell (1988) 45 Cal.3d 894,903-904.]

5          Having found that some evidence supports the Board's decision, this petition is

6   summarily **DENIED**.

7          Dated:    DEC 1 8 2007

8

9

                                    HON. DENNIS E. MURRAY
10                                  Judge of the Superior Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLAUDE STEELE C-34972
SAN QUENTIN STATE PRISION 2-N-90
SAN QUENTIN, CA 94974



08-2181 PJH

Legal
Mail

UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483